184 A.2d 602 (1962)
Sidney SAXE and Harriet K. Saxe, Plaintiffs,
v.
William G. BRADY, Jr., Hugh W. Long, Thomas F. Chalker, Clarence J. Reese, John S. Tilney, Donald L. Kemmerer, Fundamental Investors, Inc., Hugh W. Long and Company, Incorporated, Morris M. Townsend and Townsend Corporation of America and Investors Management Company, Julian K. Roosevelt, T. Kennedy Stevenson, Roger Tuckerman, William H. Lough, S. W. Smith, Howard C. Sheperd and William M. Spencer, Defendants.
Court of Chancery of Delaware, New Castle.
September 10, 1962.
Reargument Denied September 24, 1962.
*603 Ernest S. Wilson, Jr., Wilmington, and Stanley L. Kaufman, Irwin M. Taylor and Shephard S. Miller, of Kaufman, Taylor & Kimmel, New York City, for plaintiffs.
Robert H. Richards, Jr., of Richards, Layton & Finger, Wilmington, and Alfred Jaretzki, Jr., and Marvin Schwartz, of Sullivan & Cromwell, New York City, for defendants Fundamental Investors, Inc., Reese, Stevenson, Lough and Spencer.
Richard F. Corroon, of Berl, Potter & Anderson, Wilmington, and Milton Pollack and Paul Baris, New York City, for defendants *604 Hugh W. Long & Co., Inc., Investors Management Co., Brady, Long and Chalker.
The other defendants are not before the court.
SEITZ, Chancellor.
Plaintiffs became investors in 1952 in Fundamental Investors, Inc. ("Fund"), a Delaware corporation registered as an open-end investment company under the provisions of the Investment Company Act of 1940. They have brought this action on its behalf against its directors, investment adviser, and parent of its investment adviser.
Plaintiffs charge that the fees paid to Fund's investment adviser pursuant to a contract whereby the latter receives annually an amount equal to ½ of 1% of the average daily net assets of the Fund are "unreasonable, excessive and an illegal waste and spoilation of the Fund's assets". The payment of the fees and annual renewal of the contract are said to have resulted from breaches of fiduciary duty by the individual defendants in this suit.
The corporate defendants, Investment Management Company ("IMC") and Hugh W. Long and Company, Incorporated ("Long Inc."), are charged with having colluded with the individual defendants in negotiating the advisory contract and having shared in the unlawful profits thereby derived. IMC is the investment adviser of the Fund and Long Inc. its principal underwriter.
The advisory relationship between the Fund and IMC arose in 1939 (Fund was organized in 1933) and has continued since that time. In 1941, Long Inc. became the underwriter of Fund's shares, and that relationship also has remained unbroken. In 1950, Long, Inc. acquired part ownership of IMC. By further acquisition of IMC's shares, IMC became by 1954 a wholly-owned subsidiary of Long Inc. Therefore, at all times relevant to this controversy (plaintiffs have limited their claims to fees paid in the period 1955-1960) Long Inc. has been the underwriter of the Fund and IMC, its wholly-owned subsidiary, the investment adviser.
The relationships which Long Inc. and IMC perfected with Fund have been duplicated in every material respect with two other mutual funds, Diversified Investment Fund, Inc. ("DIF") and Diversified Growth Stock Fund, Inc. ("DGSF"). The advisory contract with these two funds was acquired by IMC in 1954 at the same ½ of 1% rate. Both these funds however are considerably smaller in net asset value, and the fees earned under the contracts have consequently been less. The persons who serve as directors and officers of Fund serve in the same capacity with DIF and DGSF. Also, any investor in Fund, DIF, or DGSF has the privilege of exchanging his investment in the shares of that fund for the shares of one of the others.
In 1960, IMC and Long Inc. organized a fourth fund known as Westminister Fund Inc. ("WF") for certain specialized investment purposes. The advisory fee is charged at the same ½ of 1% rate. Investors in WF, a considerably smaller fund, cannot convert their shares into those of one of the three other funds.
The structure of Fund as an investment company and the terms of the advisory contract between Fund and IMC complied in every way with the formal requisites of the Investment Company Act. It is conceded by plaintiffs that only four of the ten directors of Fund are "affiliated" directors within the language of § 15 of the Act, 15 U.S.C.A. § 80a-15. At least three of these directors have a substantial stock interest in Long Inc., a publicly-held corporation. The contract itself containing both the compensation arrangement and certain provisions whose inclusion was required by law was approved by Fund's stockholders in March 1954. At that time 99.3% of the shares actually voting voted in favor of the contract. Thereafter, *605 Fund's stockholders received periodic reports which disclosed both the rate and the dollar amount of the fee for the particular year.
In April 1960, the contract was submitted again to the stockholders for their approval. The accompanying proxy statement disclosed the pendency and nature of the present litigation. It also disclosed the affiliations of Fund's directors, the relationship between IMC and Long Inc., and the profits of the IMC-Long Inc. combined enterprise as well as the rate and dollar amount of the advisory fee. Of the 76% of Fund's shares participating in the vote, 99.1% ratified and approved continuance of the contractual arrangement theretofore existing.
Plaintiffs say that "formal" compliance with the Act and "formal" ratification do not bar plaintiffs' right to recover in Fund's behalf. Plaintiffs attack each of the many factors which defendants contend will insulate them from liability. Thus, plaintiffs say that either the so-called "non-affiliated" directors were in fact dominated by the interested directors, or, if they were not so dominated, they failed affirmatively to protect Fund's pecuniary interest by passively renewing the annual contract. Plaintiffs argue that the Investment Company Act cast a distinct burden on the non-affiliated directors to exercise vigilance in Fund's behalf.
IMC and the affiliated directors are said to have acted selfishly and in their own interest without regard for the Fund to which they all owed a fiduciary's loyalty. They are said to have manipulated the non-affiliated directors to their own ends either by direct control or by use of misleading or incomplete information. It is claimed that Long Inc. Participated in the alleged wrongs.
Finally, plaintiffs challenge the validity of the purported ratification in April 1960. Plaintiffs correctly state the well-settled rule to be that a waste of corporate assets is incapable of ratification without unanimous stockholder consent. Whether a waste of assets is present here is of course the very issue for decision.
Plaintiffs also say that ratification was ineffective for another reason. In effect they argue that the information submitted to the stockholders in the 1960 proxy statement did not fully set forth all the material facts. Plaintiffs point to a plethora of factual material which they contend, if presented to the stockholders, would have enabled them accurately to assess the merits of a continued contractual relation with IMC. Failure to supply this information they say vitiates the effect of the ratification.
I think it can fairly be said that the central issue to be decided is whether the fees paid to IMC under the advisory contract were "legally excessive" or not. Cf. Meiselman v. Eberstadt (Del.Ch.), 170 A.2d 720. Plaintiffs do not contend that there is any other ground for liability.
In this type of case a court first looks to the nature of the director action. There is no allegation or proof of actual fraud on the part of any of the directors, or indeed any of the defendants. No cause of action is asserted based on the provisions of the Investment Company Act. Plaintiffs' case therefore rests on the charge that certain of the defendants were illegally benefitted by the continuance of the advisory contract and that these parties by various means obtained approval of the contract by the non-affiliated directors who under federal law were obligated to guard the Fund's interest against any such abuse.
Assuming without deciding that the action of the nonaffiliated directors in approving the management contract must be considered as the action of an interested board, what is the effect here of the purported stockholders' ratification?
Plaintiffs contend that there was no valid ratification because the information submitted to the stockholders in the 1960 proxy statement was incomplete and misleading. They argue that the omissions were of such *606 a nature that the court must disregard the vote of the stockholders and leave the burden of proof of fairness upon the defendants. In making such contention plaintiffs have proceeded on the tacit premise that ratification is applicable either to all of their claims or none. The court adopts the same approach.
Plaintiffs' principal objection to the proxy statement is that it failed to reveal the extent of the profits being made by IMC under its advisory contracts with the group of funds that it managed. Therefore, it is said, the stockholders of Fund were unable to determine the cost to IMC of providing advisory services. The proxy statement does in fact contain the profit figure of IMC for the year 1959 as it appears on IMC's books. Apparently what plaintiffs are contending is that by an improper allocation of part of the expenses of Long Inc. to IMC, IMC was able to understate the true amount of its profits.
The dispute with regard to the accuracy of the profit figure arises in the following manner: Prior to the consolidation of Long Inc. and IMC in 1954, separate financial records were maintained by Long Inc. and IMC. This same system of separate records was maintained even after Long Inc. purchased the balance of the outstanding shares of IMC. It appears that no effort was made at that time to re-examine the existing allocations of expenditures expected to be incurred on behalf of the combined enterprise. Since management considered itself to be dealing with a single enterprise encompassing both IMC and Long Inc., financial reports were thereafter issued on a consolidated basis alone. Thus, after 1954, no balance sheet or profit and loss statement was prepared which reflected the accounts solely of IMC. Defendants contend that before 1959, the board of IMC never had occasion to consider the propriety of the expense allocations which existed at the time of the consolidation.
In the early part of December 1959, Long Inc.'s management received word that the S. E. C. might soon require that proxy statements sent to investors in mutual funds contain both the balance sheet and profit and loss statement of the advisory organization. Consequently, according to defendants, a "job analysis" was made in order to determine what part of the salaries theretofore paid exclusively by Long Inc. were allocable to IMC as a cost of the advisory function. The same process was carried out with regard to non-salary expenditures. Ultimately the amount allocated at the end of 1959 for the purpose of meeting the rumored S. E. C. requirement was $818,000.
When the proxy statement for the April 21, 1960 stockholders' meeting was prepared, it was approved by Fund's board, subject to any alterations or additions requested by the S. E. C. Thereafter, the S. E. C. required the inclusion, inter alia, of a statement of IMC's net profits. The Commission imposed no requirement with regard to a disclosure of IMC's profit and loss statement.
Plaintiffs argue that the profit figure of $663,410 for 1959 stated in the proxy statement constituted a material misrepresentation. They contend that the allocation of $818,000 to IMC at the end of 1959 and a further allocation of $160,416 as part of the expenses of the so-called "Share Accumulation Account" were improper and that the profits of IMC should be increased by these amounts.
Assuming that the profits of IMC were a material factor in the stockholders' decision to ratify the contract, was there in fact a misrepresentation? It is conceded that the statement of profits was accurate if the allocations of expenses to IMC were proper.
I turn first to the allocation of part of the expenses of the Share Accumulation Account to IMC. This "Account" provides a systematic method by which investors may purchase shares of the Fund. The investor appoints the First National Bank of Jersey City as his agent to receive sums from him for the purchase of shares, to receive dividends, and to reinvest the proceeds. The *607 expenses of the custodian are charged to the Fund, but the expenditure is borne by the Long Inc.-IMC combined enterprise. Since 1954, the whole of the cost has, in the first instance, been charged to IMC, though 20% was subsequently allocated to Long Inc. Plaintiffs contend (1) that IMC was not obligated to pay this amount under its advisory contract and (2) that the Share Accumulation Account relates wholly to the underwriting aspect of the mutual fund business, and therefore IMC could not properly be charged with any part of the expense. Thus, these expenses were removed by plaintiffs' accountant from his computation of IMC's overall profit.
I find that with respect to this expense the court cannot permit plaintiffs' re-computation. It appears from the record that this particular allocation was made on IMC's books on a yearly basis beginning in 1954. Plaintiffs do not argue that the amount was not actually paid by IMC. Rather, they contend that this was not an expense that IMC was obligated to pay under its advisory contract with Fund. I am of the opinion that in determining whether this expense was properly chargeable to IMC, management was not bound to limit itself to those amounts which it was legally required to pay under the contract. In Krieger v. Anderson (Del.Ch.), 182 A.2d 907, the Supreme Court of Delaware implicitly recognized the corporate status of the management company separate and apart from the fund itself. If such a company pays a legitimate item of expense, I think it can properly charge the amount of that expense against its income.
Plaintiffs argue secondly that even though it is found immaterial whether IMC was obligated to pay this amount under the contract, it is still relevant to consider whether this expense is at all chargeable against advisory income. Plaintiffs say that the costs involved relate to the maintenance of stockholder records and that since the custodian is in effect purchasing new shares for investors, these costs should be chargeable to the underwriter rather than the investment adviser. The question then is whether this expense is properly attributable to the underwriting or to the advisory function. It is conceded that the obligation in the first instance is that of the Fund. It is agreed that neither Long Inc. nor IMC is specifically bound to pay this amount under the terms of its particular contract. Ultimately, then, plaintiffs are challenging the judgment of management in charging 80% of this expense to IMC.
In order to sustain plaintiffs' position on this point the court would be required to rule that the allocation undertaken was unreasonable. Was this allocation within the range of management's discretionary power? Contrary to plaintiffs' argument, I cannot say that these expenses were wholly unrelated to investment-management or advisory services. Management chose to categorize these amounts as the cost of maintaining certain stockholder accounts, a managerial function, rather than as a cost of selling shares. I do not think that its conception of the nature of these expenses was clearly wrong or that the court should overturn its judgment. Certainly this is so at least for purposes of deciding whether the treatment of this item resulted in a misrepresentation of profits in the proxy statement.
Next, I turn to the end-of-year allocation of $818,000 in 1959. The challenge to the propriety of this allocation must be viewed from two separate aspects. First, plaintiffs seek to impugn the allocation by showing that the motive which prompted it arose other than from a desire to set out more faithfully the "true" expenses of IMC's operations. Secondly, plaintiffs argue that even if the motive was pure, the allocations themselves were wholly unreasonable having no relation to IMC's purported function as investment adviser.
The facts underlying this allocation are as follows: After the 1954 consolidation of IMC and Long Inc. no effort was made by the directors of either company to reapportion expenses between them. Since the *608 combined enterprise was treated as a single taxpayer, there was no necessity for preparing separate reports of any nature for IMC. Defendants claim that only the rumor of impending S. E. C. regulation moved them to reconsider the existing allocations of expenses of Long Inc. and IMC. The $818,000 end-of-year charge to IMC is said to be a reasonable allocation of expenses which were paid by Long Inc., but were properly attributable to IMC.
On the issue of motive plaintiffs claim that it was fear of exposure that prompted the allocation, not any concern for a proper adjustment. Plaintiffs argue that when bills were presented to the enterprise, someone in the organization had to decide which company would pay them. When this was done, plaintiffs say, a judgment was thereby made as to the propriety of allocation. Thus, plaintiffs point out that IMC had periodic charges in nearly every category of expense from depreciation to salaries. They contend that defendants have shown no reason why these original apportionments were not entirely proper in determining the expenses of IMC. Plaintiffs also demonstrate that with regard to salaries Long Inc. was already making certain monthly allocations to IMC. Plaintiffs say that this proves that management was cognizant of the allocation problem and was taking adequate steps to remedy whatever errors might have occurred. These monthly allocations were not part of the end-of-year allocation of which plaintiffs complain. Also, it has been shown that end-of-year allocations were made in both 1957 and 1958 of $72,000 and $150,000 respectively.
Does the evidence on the question of motive indicate a consciousness on the part of the managers that the books of IMC were in proper order before the $818,000 allocation and a determination thereafter falsely to shrink IMC's profits? I do not believe such a finding can be made on this record. Defendants' evidence is uncontradicted that at the time Long Inc. gained control of IMC no effort was made to make a rational reapportionment of expenses. Thereafter there seems to have been no necessity for them to do so. Defendants meet plaintiffs' argument that the monthly allocations of salary indicate recurring attention to the problem of adjusting expenses between the two companies by showing that these allocations were made at a lower level in the bookkeeping department. Defendants say that until 1959, neither the board of IMC nor its executive officers ever took notice of the bookkeeping process. Are the allocations in 1957 and 1958 inconsistent with defendants' explanation? The record here apparently does not indicate when those two allocations were made. Defendants readily admit there is no rational basis for either of them in amount and say that they have no knowledge when or how they were made.
Viewing all the evidence in the case, I cannot find that the motive underlying the 1959 allocation was a desire to state improperly the accounts of IMC. It is true as plaintiffs suggest that the circumstances under which the allocation was made provided a certain incentive to allocate costs so as to minimize IMC's profits. Nevertheless, on the whole, I am satisfied that serious thought was given to the problem of allocating expenses only in 1959 when the interest of the S. E. C. became known. Consequently, management had a legitimate reason for re-examining the books at that time. The court, therefore, cannot infer that the whole of the allocation should be disallowed on the ground that previous adjustments reflected the true state of affairs and that the 1959 allocation was wholly unjustified.
Next, having found the 1959 allocation consistent with a proper purpose, I am then faced with the question whether the allocations made with regard to each item of expense were proper. Plaintiffs take the position that even if IMC's management acted with a proper purpose, the amounts finally allocated do not accurately reflect the expenses attributable to IMC's operations in 1959. Therefore, the court is asked for purposes of the "misrepresentation" issue *609 to strike down that part of the allocation which cannot be charged to IMC. For convenience the whole of the allocation may be broken down into two categories  salary and non-salary expenditures.
Plaintiffs' attack on non-salary expenditures involves a sampling of the various expenses paid by Long Inc. during the year. Apparently, management allocated a percentage of the whole of each category of expense on Long Inc.'s books to IMC. Many of these items were allocated on a basis of 80% of the expense on Long Inc.'s books to IMC, while 20% remained with Long Inc. In several cases a lesser percentage was charged to IMC. The amounts which were allocated to IMC in this process were added to amounts which had already been placed on IMC's book during the course of the fiscal year. In the cases of some categories of expense no amounts appeared on the books of IMC prior to the end-of-year allocation from Long Inc.
I am of the opinion that upon this record the evidence is insufficient to show that the allocation as between Long Inc. and IMC was clearly improper. Admittedly the vouchers submitted to the court as evidence were but samples of the total number of vouchers available. They were admitted for the limited purpose of permitting the court to determine what weight should be accorded the allocation of expenses made by plaintiffs' witness. That witness, Mr. Putterman, stated that his computation was based on Long Inc.'s handling of similar vouchers in prior years, the terms of the advisory contract, and the nature of the function which IMC performed. The merit of the first two considerations has already been dealt with in the discussion of the Share Accumulation Account. The third consideration upon which Mr. Putterman based his computation brought him necessarily in the realm where judgment was to be exercised. In effect Mr. Putterman, by using the three tests which he thought relevant, found that Long Inc.'s allocations were improper and therefore substituted his own judgment for that of the management.
I cannot find sufficient evidence on this record to overturn management's allocation. The vouchers submitted may be taken to present plaintiffs' case in its strongest light. As substantive evidence they are not so clearly attributable to the underwriting function that one can infer that any allocation to IMC of the expenses contained therein was improper. Thus, standing alone, they are persuasive neither that the allocations were improper nor that Mr. Putterman's judgment as to these matters was free from doubt.
But by refusing to overturn these allocations, the court does not thereby affirmatively approve them. The area of corporate affairs here involved is one in which an element of judgment is always present. In this case the difficulty is compounded by the reluctance of the court to interfere where the allocation was effected between a parent company and its wholly-owned subsidiary. In short, the inquiry is not as meticulous as one where liability is predicated solely upon the propriety of allocations between two companies. In the present case, upon the record before me, I conclude that the allocations did not result in a material misrepresentation in the proxy statement.
The foregoing discussion is applicable to the allocations of salaries as well, with the added qualification that plaintiffs' case is even weaker on this question. Defendants were able to show that Long Inc. had paid the salaries of at least seven Fund executives which thereafter were not allocated as expenses to IMC until 1959. IMC was obligated to pay salaries to these executives under the advisory contract. Plaintiffs say that Fund's board had never voted these men any salaries, but it is not contended that they did not perform any services. One can readily appreciate in the case of a combined enterprise involving a wholly-owned subsidiary the indifference toward any allocation of the salaries of the top officials. On this score defendants' case is considerably strengthened. While again there is some question whether, standing alone, an allocation to IMC of 80% of the *610 expenses for salaries on Long Inc.'s books was appropriate, the record as a whole does not permit the judgment of management to be overruled.
Parenthetically, it should be noted that the profit figure appearing in the proxy statement represents IMC's profits from all income sources, not merely from the contract with Fund.
Plaintiffs also point to other alleged omissions or misrepresentations. I have reviewed them and find that these further objections are without merit. I therefore, conclude that plaintiffs' claims must be tested by legal standards applicable to stockholder ratification cases.
When the stockholders ratify a transaction, the interested parties are relieved of the burden of proving the fairness of the transaction. The burden then falls on the objecting stockholders to convince the court that no person of ordinary, sound business judgment would be expected to entertain the view that the consideration was a fair exchange for the value which was given. Gottlieb v. Heyden Chemical Corporation, 33 Del.Ch. 177, 91 A.2d 57; Kaufman v. Schoenberg, 33 Del.Ch. 211, 91 A.2d 786. While the cited cases involved stock options, one of the fundamental issues there presented, viz., the relationship of the value received by the corporation to the benefit bestowed, is also present here. The test which the court must apply in this area has recently been restated in Beard v. Elster, (Del.Ch.), 160 A.2d 731. While the Supreme Court was not there concerned with interested board action, it took occasion to review the Gottlieb decision and reaffirmed the principles expressed therein.
Where waste of corporate assets is alleged, the court, notwithstanding independent stockholder ratification, must examine the facts of the situation. Its examination, however, is limited solely to discovering whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid. If it can be said that ordinary businessmen might differ on the sufficiency of the terms, then the court must validate the transaction.
Therefore, I now consider the question whether the compensation paid under the advisory contract was in fact legally excessive under the controlling test. Plaintiffs apparently limit their claims to amounts paid in the period 1955-1960. In 1954, IMC undertook the management of DIF and DGSF. Consequently, its total fees from three advisory contracts and its net profits showed substantial increases in the following year.
Preliminarily, several observations should be made about the nature of the inquiry that the court will undertake. A court is confronted with inherent difficulties in determining whether payments for services are "reasonable" or "excessive". The value of services is obviously a matter of judgment on the part of the person who must pay for them. Thus, courts are often shielded by presumptions which wisely cause them to defer to decisions of directors or stockholders. Nevertheless, it is clear both in law and in fact that compensation payments may grow so large that they are unconscionable. See Meiselman v. Eberstadt (Del. Ch.), 170 A.2d 720; Lieberman v. Becker (Del.Supreme Ct.), 155 A.2d 596.
What "yardstick" can the court bring to its task? In Meiselman v. Eberstadt, supra, the court examined the facts from plaintiff's point of view and then undertook to compare the results with amounts paid to other persons performing the same kind of services. Failing to find any "shocking disparity" between these two sums, even though the amounts paid to defendants exceeded the industry average, the court concluded that the amounts paid were not "legally excessive".
What is the magnitude here of the sums in question? In 1952, when plaintiffs purchased *611 their shares, Fund had total net assets of approximately $130,000,000. At ½ of 1% the advisory fee paid to IMC amounted to $680,000. Thereafter, the Fund grew progressively larger. In 1954, the last year in which plaintiffs are willing to concede the reasonableness of the fee, IMC received $1,019,000. By 1960, the value of Fund's assets had reached $590,000,000. The fee, computed at the same contract rate, amounted to $2,780,000. It is plaintiffs' contention that in each of the years after 1954, the dollar amount of the annual fee was so large that it bore no reasonable relation to the value of the advisory services then being rendered by IMC; and thus, presumably, no person of ordinary, sound business judgment would deem the services worth what Fund had paid for them.
Taking into account all the financial data contained in the record, can the court find that the challenged payments have in fact exceeded the range of reason? Admittedly the task is not an easy one, nor is it free from doubt. Resolution of the question ultimately depends on the weight to be attributed to each of the very many economic factors argued to the court.
In reaching its decision, the court is cognizant of the fact that the risk of non-persuasion rests with plaintiffs.
What support for their position can plaintiffs draw from the rate of the advisory fee? First it may be observed that if the flat ½ of 1% rate prevailed throughout the industry, this would be a very weighty consideration in determining the question of excessiveness. Defendants show that 58.3% of all funds active as of June 30, 1961 were charged a flat ½ of 1%, while 29.1% were paying more than that rate. Together these groups controlled 68.9% of all mutual fund assets. Plaintiffs do not challenge these figures. Instead they claim that comparisons based on the industry as a whole are misleading. Plaintiffs restrict the basis for their comparison to eighteen of the largest funds. It is their contention that the larger a fund grows the cheaper it is to manage per dollar of invested assets. See, Jaretzki, "The Investment Company Act: Problems Relating to Investment Advisory Contracts", 45 Va.L.Rev. 1023.
The eighteen funds chosen for comparison are those having $200,000,000 or more of assets as of December 31, 1960. Of these, twelve were charged less than an aggregate ½ of 1% annually for advisory services. Plaintiffs would further restrict the basis for comparison to funds having assets in excess of $500,000,000. In this category of six funds, however, three funds (including Fund) charge a flat ½ of 1% while three charge variable rates which are adjusted downward as the amount of assets increases. Plaintiffs point to the fact that the fees paid by the two mutual funds grouped with Fund are similarly under minority stockholder attack on the ground of waste.
Based on the rate of payment alone, plaintiffs' claim of excessiveness hardly seems conclusive. The most that may be said is that there is a tendency for the rate among the larger funds to be less than a flat ½ of 1%. Nevertheless, among these funds that rate is neither extraordinary nor uncommon. It may be argued that all these larger funds paying fees of ½ of 1% are subject to judicial attack on the ground of waste and further that the directors of each of these funds should not be permitted to justify the advisory contract of their fund by pointing to the rate paid by any of the others. In effect an argument of this type would challenge the validity of any test based on comparisons of funds of the same size. The answer to this must be that the court cannot assume that each of these comparable funds paying ½ of 1% is thereby wasting its assets. Nor can it conclude from the mere fact that others of these funds are paying less, that any increase in their payments for advisory services would necessarily constitute waste. Both are but factors to be considered under the governing test. In the present case an overwhelming *612 majority of Fund's stockholders ratified previous payments and authorized future ones. Surely, this is some indication that under all the circumstances the rate paid to IMC was a commercially realistic one.
I am of the opinion that under all the circumstances the rate paid to IMC must favor a finding of reasonableness. It is a matter of common knowledge that compensation for advisory services in the mutual fund industry is paid on a percentage basis. This provides an incentive for the manager to increase the size of the Fund. Growth in the value of a fund's assets benefits the stockholders. If a particular fund evidences a history of continued growth for a period of years with a consequent increase in the amount of compensation, courts will not readily find in retrospect that the compensation paid was beyond the range of reason. Where the rate of payment has remained unchanged, one must recognize both a legitimate expectation on the part of the managers and reasonable notice to the stockholders that payments are likely to increase.
Next, plaintiffs say that notwithstanding the fact that the rate standing by itself is not unreasonable the dollar amounts paid under that arrangement were in fact excessive.
Plaintiffs choose for comparison purposes the three funds having over $500,000,000 in assets that pay less than a flat ½ of 1% in fees. The following chart indicates the relevant facts with regard to these funds as of December 31, 1960:

 Net Assets Fee Rate Fee Payable
 (1) Affiliated 632,728,854 ½ of 1% annually 1,769,322
 for first
 $50,000,000; 3/8
 of 1% on next
 $50,000,000 and
 ¼ of 1% on balance
 (2) M. I. T. 1,508,349,600 Variable, declining 1,248,000
 formula resulting (Trustees'
 in payment of 2.52% Commission)
 of gross earnings
 (3) Wellington 1,087,130,246 ½ of 1% on first 2,592,974
 70,000,000; 3/8
 of 1% on next
 $50,000,000 and ¼
 of 1% on balance

If Fund were paying fees at the same rates as these funds, its payments in 1959 and 1960 would have been:[1]

 1959 1960
 Fund's Assets 599,400,000 590,800,000
 (1) Affiliated's rate 1,686,000 1,664,500
 (2) M. I. T's rate (Not calculable from available data)
 (3) Wellington's rate 1,736,000 1,714,500

*613 It appears from the charts set out above that Fund pays approximately $1,000,000 more for advisory services than it would have paid had it adopted the rate scale of either Affiliated or Wellington. Also, it will be noted that while Affiliated nearly matched Fund in size, Wellington owned almost twice the amount of assets. The two funds not shown on plaintiffs' chart are Investors Mutual and Investors Stock with assets of 1599.20 and 713.10 million dollars respectively. These, of course, though under stockholder attack, also pay ½ of 1% annually. Therefore, the dollar amounts of fees paid by these funds exceed even those paid by Fund to IMC.
Plaintiffs say that the court should disregard the amounts paid by Investors Mutual and Investors Stock and trim Fund's fees in accordance with the rates paid by Affiliated or Wellington. There are several reasons why the court may not do so. First, it cannot be assumed that the fees of Affiliated or Wellington automatically establish the legitimate outer limit of payments for advisory services. Secondly, there is nothing in the record to indicate that the services rendered to these funds are the same in quality or quantity as those rendered by IMC to Fund. Plaintiffs have submitted a chart derived from Weisenberger, Investment Companies, (1951 ed.) which compares the performance over a ten-year span of eighteen funds with assets in excess of $200,000,000. On that chart Fund is tied for seventh place, while Affiliated ranks tenth and Wellington fifteenth. I am not suggesting that a complaining stockholder cannot prevail in a suit of this type unless he demonstrates in detail that the services performed by his fund's investment adviser are exactly comparable to those of another fund's adviser. Nor do I suggest that performance is a "touchstone" in determining whether the amounts paid are reasonable. Nevertheless these factors do tend to indicate that a large degree of variation in the amounts paid is unexceptionable and that fees falling in the higher range are not necessarily excessive. Here Fund's fees in 1959 and 1960 exceeded those of Affiliated and Wellington by about 60%. I do not think that the amounts on their face were clearly excessive.
Plaintiffs next say that if the dollar amounts of the fees standing by themselves do not establish "excessiveness", then the amount of profit earned by IMC under the contract will demonstrate that fact.
I think it well to keep in mind the fact that the profits of IMC can never be more than an "indicator" of excessive payments. Large profits themselves would not be determinative. The question is whether the cost to Fund of obtaining advisory services bears some reasonable relation to the value of the services rendered. The payments are made to IMC pursuant to the contract. If the amounts paid are not "excessive" at the time of payment, the allocation of receipts between Long Inc. and IMC or the extent of IMC's profits are of no legal concern to Fund's stockholders.
What then were the "profits" of IMC during the period in question that can be attributed to Fund's contract?
Plaintiffs argue that the proper way to view IMC's "profits" is to compare the amount of the fee paid by Fund in each year with the amount of profit attributable to that fee after payment by IMC of all proper expenses including salaries. Determining the amount of profit attributable to this particular contract involves in the present context the resolution of two distinct problems. First, the court must decide what part of the allocations from Long Inc. can be allowed to IMC as a proper charge against income. Secondly, the court must arrive at some formula whereby the total allowable expenses may be apportioned among each of IMC's sources of advisory income. Once it is determined what amounts are expended by IMC in fulfilling its obligation to Fund, the dollar amount of profit attributable to the contract with Fund can easily be computed.
In order to simplify the matter the following charts are drawn in a light most favorable to plaintiffs by disallowing, arguendo, *614 as an expense to IMC any part of the allocations from Long Inc. (which amounted in 1959 to almost one million dollars).
The first chart below shows (1) the total amount of fees of IMC received from all sources and (2) IMC's net profits before federal income taxes:

 (1) (2)[2]
1952 806,000 478,000
1953 875,000 652,000
1954 (11 mos.) 1,210,000 657,000
1955 1,890,000 1,228,000
1956 2,305,000 1,610,000
1957 2,415,000 1,706,000
1958 2,538,000 1,837,000
1959 3,530,000 2,543,000
1960 3,742,000 2,740,000[3]
The next chart illustrates what plaintiffs deem to be the crucial issue, viz., (1) the dollar amount of the annual fee paid by Fund alone as compared with (2) the profit of IMC attributable to that fee (before federal income taxes):

 (1) (2)
1952 680,000 408,000
1953 757,000 417,000
1954 (11 mos.) 915,000 473,000
1955 1,425,000 896,000
1956 1,789,000 1,232,000
1957 1,899,000 1,332,000
1958 1,998,000 1,437,000
1959 2,789,000 1,999,000
1960 2,780,000 1,965,386[4]
In determining the portion of the total expenses of IMC (less federal income taxes) which were attributable to the contract with Fund, the court adopted a procedure suggested by plaintiffs. Plaintiffs found that for the period 1952-1959 the fees paid by Fund to IMC represented 80% of all fees received by IMC from all sources. Thus, 80% of the total expenses of IMC were deemed to be the cost to IMC of providing advisory services to Fund. Admittedly, the application of such a formula is a "rule of thumb", since it does not account accurately for those expenses of IMC which are of direct benefit only to a particular fund. Nevertheless, it is no less accurate than any other formula suggested to the court.
In their brief, plaintiffs suggested another method of dividing IMC's expenses in this particular situation. By this method the total expenses of IMC would be divided into aliquot shares depending on the number of funds managed. Plaintiffs' rationale is that each of the funds is receiving expert investment advice of the same quantity and quality, and therefore the expenses are attributable to each fund in equal shares.
Two objections may be offered to such an approach. First, IMC offers much more than just investment advice. It is obligated to carry out under each of its contracts active management of every phase *615 of the fund's business  except for the underwriting function. The costs of managing Fund, by far the largest of the funds, are necessarily greater than those incurred with regard to the others. Secondly, although arguably it may be true that each fund receives the same investment assistance, it does not follow that IMC's total expenses should be apportioned equally among them. Perhaps, a substantial part of the total expenses of IMC should be apportioned to each fund  even though the sum total of these "expenses" would exceed the actual cash expenditure of IMC. In Krieger v. Anderson (Del.Ch.), 182 A.2d 907, the Supreme Court acknowledged the fact that these management companies are themselves organized for profit. It would seem to follow that the "work product" of such a company is its own property until it contracts to sell it to a particular fund. Thus, from the point of view of the fund purchasing that service, the profits of the management company attributable to the particular contract are the dollar amounts paid by the fund less the "objective cost" of producing the service. From the point of view of the fund, the "profits" from the particular contract would not increase even if the management company were to succeed in selling its product to another fund. The "objective cost" would remain the same.
Since plaintiffs' argument in favor of an equal apportionment of IMC's expenses cannot be accepted, the court therefore for purposes of this decision has adopted plaintiffs' 80%-20% division of IMC's total expenses, 80% to be attributed to the services rendered to Fund.
Based on the rulings and assumptions made, can it be said that IMC's profit on the contract with Fund are indicative of legally excessive payments by Fund under its management agreement for 1959?
What "devices" may a court employ in answering this difficult question. First of all, I re-emphasize that under the present state of the law the management company is entitled to make a profit apart from salaries paid to its executive personnel. Next, it must be emphasized that the very nature of the compensation arrangement (percentage of asset value) lends itself to the payment of sums having no necessarily reasonable relationship to the "value" of such services if tested by compensation standards usually applied in the business community. Yet, such an incentive arrangement is not to be condemned for that reason alone, since it is not unusual to adopt compensation arrangements which attempt to compensate in terms of a percentage of the assumed total benefit. However, under this type of management agreement payments are made regardless of growth and are also calculated not only on the growth from appreciation of assets, but also on the proceeds received from sales of shares to new investors. It is also inherent in the "percentage-of-assets" approach that at some point the relationship between admittedly reasonable expenses and net profits can become so disproportionate as to be shocking by any pertinent standard. The various factors mentioned must be kept in mind as we try to evaluate the particular profits here involved.
One approach to resolving this difficult question would be to compare IMC's net profits from the Fund contract for 1959 with the profits earned by other management companies on a contract with a single fund. Unfortunately, the net profits of other management companies arising from the management of particular funds are not part of this record, if indeed they exist as a matter of public information. Consequently, one cannot indulge in what would be an important comparison.
Or, one might compute IMC's ratio of expenses incurred in providing services to Fund to profits earned on that contract and compare that ratio with those of similar management companies. Once again, however, the record unfortunately does not permit such a comparison.
As has already been mentioned, performance is not of decisive importance on the issue posed.
*616 Plaintiffs claim that in 1959 IMC was rendering only the same services it rendered in 1954 for a substantially smaller fee, even with due allowance for a legitimate increase in administrative service. Thus, plaintiffs say the vast increase in profits from 1954 to 1960 cannot be justified on the basis of a comparable increase in the quality or quantity of service rendered. They cite cases where courts have announced the principle that large salary increases to a man continuing to render substantially the same services constitutes waste. Defendants counter these cases by claiming that the quality of the operation has vastly improved even though the increase in the number of analysts has remained about the same.
It seems clear at once that it is difficult to apply the cases relied upon by plaintiffs to a fund-management company arrangement. First of all we are not dealing with a straight salary agreement but with a "percentage of assets" arrangement. The two may produce substantially different results. Moreover, one cannot assume that the profit in 1954 represented the upper limit of reasonable profit for the services in that year. Thus, I cannot conclude that a comparison of some or all of the organization in 1954 with its composition in 1959 is of decisive importance in evaluating the extent of the profits here. I do concede that it is relevant to that issue and is a factor which I consider in making my ultimate determination.
What of the profits? If we accept plaintiffs' re-allocation of expenses as between Long, Inc. and IMC, IMC'S profits from its contract with Fund rose dramatically in 1959. I emphasize that this is making a "large" assumption in plaintiffs' favor. The profits have been on the rise because the Fund has been growing. But can I say that the profits before taxes from the Fund contract alone, amounting to $2,000,000 for 1959 and the same for 1960, were so great, either in an absolute sense or when compared with such material as here exists, that they indicate a waste of Fund's assets? Considering the size of this Fund, about $600,000,000, the substantial organization provided by defendants to implement the management contract and the other factors herein mentioned, I am unable to conclude that the payments, while large, warrant a finding of waste. After all, if this Fund was to do its own work and make all compensation payments to its own personnel, a court would be reluctant to say that total expenses of about $3,500,000 to administer a fund of $600,000,000 indicated waste. It is true that other funds obtain the same for less, but that is not decisive. Certainly Fund does not stand alone. Nor is it unusual to find service companies making large profits with relatively small costs. If the fund-management company format is to be legally questioned, such inquiry must come from some other place. It obviously permits those providing management advice to obtain at least some of their compensation on a long-term capital gains basis (hopefully). But this approach is neither condemned nor unknown in the business world.
In reaching my decision I have here assumed, without deciding, that an independent board was not present and thus that the board's action must be evaluated on principles applicable in stockholder ratification cases. Since the management contract must be re-evaluated by the board of the Fund at fixed periods, ideally a truly independent and active board would be expected to be alert to the factors I have mentioned. In other words, it is not to be assumed that an independent board would wait until the fees paid under the management contract warranted a finding of waste before attempting to negotiate a better deal. Based on the 1959 and 1960 figures the profits are certainly approaching the point where they are outstripping any reasonable relationship to expenses and effort even in a legal sense. And this is so even after making due allowance for incentive and benefit presumably conferred. This is not to say that no payment is justified after a fund reaches a particular size. It is only to say that the *617 business community might reasonably expect that at some point those representing the fund would see that the management fee was adjusted to reflect the diminution in the cost factor.
After such consideration as can be accorded the issue on this record, I conclude that plaintiffs have not sustained their burden of establishing under governing legal standards that the fees for the years mentioned should be characterized as legally excessive. Thus, the complaint must be dismissed.
Present order on notice.

On Motion for Reargument
The first ground of plaintiffs' motion for reargument is that the court erroneously decided that the stockholders of Fund ratified the advisory agreements for the period 1955 through 1960. I emphasize that the ratification issue was treated by plaintiffs and considered by the court as applying to each of the years in question. Plaintiffs say that § 15 of the Investment Company Act of 1940 prevents retroactive ratification or approval of such agreements. They further contend that that provision may not be waived in view of § 47(a) of the Act, 15 U.S.C.A. § 80a-46. Thus they contend that the stockholder ratification principle was improperly applied in this case. These reasons were not heretofore advanced by plaintiffs. The answer is that the "ratification" and "approval" with which the Court was concerned in its opinion had nothing to do with compliance with § 15. The Court's concern was merely with the placing of the burden of proof on the waste issue. Consequently, no question of waiver of compliance with the requirements of § 15 arises.
The second ground of plaintiffs' motion is that the court erred in concluding that the effect of the ratification was to shift to plaintiffs the burden of proof as to the excessiveness of the management fees charged to Fund by IMC. Again, plaintiffs rely on § 15 of the Investment Company Act to support their position. As noted before the court was not concerned with an alleged violation of § 15. The "ratification" found in the opinion gave the court the benefit of the stockholders' view on the excessiveness charge with the legal consequence of shifting to plaintiffs the burden of proof on the issue of waste under Delaware law.
The third ground of plaintiffs' motion is that the court erred in concluding that plaintiffs had the burden of proof as to the propriety of the 1959 allocation of expenses between Long Inc. and IMC. The allocation claim was made in connection with their argument that IMC's 1959 profits were mis-stated in Fund's 1960 proxy statement. They argue that the alleged misrepresentation prevented the application of the burden of proof rule otherwise applicable to stockholder ratification cases. Plaintiffs further say that the conduct of IMC and Long Inc. with respect to the proxy representations is to be measured not by the rule of ordinary judgment but by the highest fiduciary standards.
First of all, the court did not impose the burden of proof on plaintiffs with respect to the allocations. The court necessarily pointed out the areas where plaintiffs charged the defendants with actions which resulted in the alleged misrepresentations, but this was only to identify the issues. The appropriate defendants were presumed to have the burden of showing that the proxy statement was adequate to justify the application of the stockholder ratification rule. Schiff v. RKO Pictures, 34 Del.Ch. 329, 104 A.2d 267, 278. Moreover, the court agrees that the conduct of those responsible for the representations in the proxy statement had to be measured by standards applicable to fiduciaries.
The trouble in this case was that the area of concern involved one of the most trouble-some of all problems  judgment concerning the allocation of expenses as between closely related entities whose functions intimately impinge upon one another. The court *618 reviewed the judgments made and concluded that it had no reasonable basis to substitute its judgment for that employed. Compare Schiff v. RKO Pictures, above. This was so even though the pertinent fiduciary standard was kept in mind. This was certainly not to say that the burden was on the plaintiffs. Rather, I concluded that defendants carried their burden on the record before me.
The motion for reargument is denied.
NOTES
[1] These formulas were applied to Fund's net asset value at the end of each respective year rather than to the average daily net assets. Thus, to a certain extent the resulting figures are inaccurate.
[2] The net income of IMC was inflated in each year by plaintiffs' removing from IMC's expenses amounts attributable to the Share Accumulation Account (1954-1960) and the end-of-year allocations from Long Inc. in 1957, 1958, and 1959 of $72,000, $150,000 and $818,000 respectively.

The tabulation reflects charges against income resulting from payments by IMC to one, Melhado, of $50,000 a year for the years 1952-1957. Plaintiffs attack the propriety of such charges. These amounts have been retained as expenses, because they were deemed to be detrimental to plaintiffs' present contention. In any event, even if plaintiffs' treatment were adopted, my basic conclusion would not be altered.
[3] No allocation was in fact made in this year. Instead those expenses which in 1959 had been allocated to IMC at the end of the year were charged directly to IMC's books when paid. Thus, plaintiffs could not determine the amount of expenses which were to be considered as improperly attributed to IMC. Consequently, the 1960 profit-before-tax figure was obtained by estimating the challenged expenses to be $818,000 (an amount equal to the 1959 allocation).
[4] Here, again, aside from the Share Accumulation Account the amount deemed by plaintiffs to be improper charges against IMC's overall income was estimated at $818,000.