# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MICHAEL CONTE, derivatively on behalf of SKECHERS U.S.A., INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) ) | C.A. No. 2022-0633-MTZ |
| ROBERT GREENBERG, MICHAEL GREENBERG, DAVID WEINBERG, KATHERINE BLAIR, MORTON ERLICH, RICHARD SISKIND, JEFFREY GREENBERG, GEYER KOSINSKI, and RICHARD RAPPAPORT, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| SKECHERS U.S.A., INC., | ) ) ) | |
| Nominal Defendant. | ) | |

## MEMORANDUM OPINION

Date Submitted: October 19, 2023
Date Decided: February 2, 2024

Thomas A. Uebler, Terisa A. Shoremoun, MCCOLLOM D'EMILIO SMITH UEBLER LLC, Wilmington, Delaware; Melinda A. Nicholson, Nicolas Kravitz, KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; Roger A. Sachar, NEWMAN FERRARA LLP, New York, New York; Domenico Minerva, LABATON SUCHAROW LLP, New York, New York, *Attorneys for Plaintiff Michael Conte.*

A. Thompson Bayliss, E. Wade Houston, Eliezer Y. Feinstein, Daniel G. Paterno, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Brad D. Brian, John M. Gildersleeve, Abraham B. Dyk, MUNGER, TOLLES & OLSON LLP, Los

Angeles, California, *Attorneys for Defendants Katherine Blair, Morton Erlich, Richard Siskind, Jeffrey Greenberg, Geyer Kosinski, and Richard Rappaport*.

Kenneth J. Nachbar, Susan W. Waesco, Miranda N. Gilbert, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Abby F. Rudzin, O'MELVENY & MYERS LLP, New York, New York, *Attorneys for Defendants Robert Greenberg, Michael Greenberg, and David Weinberg*.

Matthew F. Davis, Tyler J. Leavengood, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Kenneth A. O'Brien, Jr., SHEPPARD MULLIN RICHTER & HAMPTON LLP, Los Angeles, California, *Attorneys for Nominal Defendant Skechers U.S.A., Inc*.

**ZURN, Vice Chancellor.**

Plaintiff Michael Conte ("Plaintiff") is a stockholder of Skechers U.S.A., Inc. ("Skechers" or the "Company"). He alleges the Company's board of directors (the "Board") failed to impose meaningful restraints on executives' personal use of the Company's two corporate airplanes. Skechers' founder, his family, and another officer made liberal use of Skechers' corporate airplanes, racking up millions in expenses. The COVID-19 pandemic exacerbated this perceived problem: business travel waned more than their personal use of the airplanes. At the peak, more than 50% of each airplane's use was for personal travel. Plaintiff alleges the higher ratio of personal use caused the Company to lose certain favorable tax treatment and demonstrates the second airplane was no longer needed. He filed this action asserting claims for breach of the duty of oversight, waste, breach of contract, and disclosure violations. The defendants moved to dismiss.

Plaintiff did not make a demand on Skechers' Board and therefore must plead demand was futile under Court of Chancery Rule 23.1. The parties disagree as to whether certain directors face a substantial likelihood of liability for the oversight, waste, and disclosure claims. I conclude they do not. They also disagree as to whether one of the directors lacks independence from Skechers' founder and largest stockholder. I conclude he does not. Plaintiff has failed to plead demand is futile, and the motions to dismiss are granted.

1

## I.   BACKGROUND[1]

Nominal defendant Skechers is a shoe company founded by defendant Robert Greenberg.  Robert serves as Skechers' CEO and chairman of the Board.  One of Robert's sons, defendant Michael Greenberg, serves as Skechers' president and a director.  Another son, defendant Jeffrey Greenberg, is a Skechers vice president and served as a director until December of 2021.  Together they hold 55% of Skechers' voting power.  Robert alone controls about 52% of Skechers' voting power.[2]

Skechers owns and operates two corporate airplanes.  Relevant here, Robert, Michael, and defendant and Skechers' COO David Weinberg (together, "the Management Defendants") used the corporate airplanes for personal and business

---

[1] The facts are drawn from the operative complaint, the documents integral to it, and those incorporated by reference.  *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004).  Plaintiff demanded and received books and records before filing his complaint in this action.  That production was made pursuant to an agreement providing that documents Skechers produces "shall be deemed incorporated by reference in any complaint . . . filed by [Plaintiff]."  D.I. 26 at Aff. [hereinafter "Houston Aff."], Ex. 24 ¶ 8.  Those books and records are incorporated by reference.  *See Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 796–98 (Del. Ch. 2016), *abrogated on other grounds by Tiger v. Boast Apparel, Inc.*, 214 A.3d 933 (Del. 2019).  Further, "[t]he court may take judicial notice of facts publicly available in filings with the SEC." *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1168 (Del. Ch. 2002).  Because multiple defendants in this action share the surname Greenberg, I will refer to each by their first name for clarity. I intend no familiarity or disrespect.

[2] *See* D.I. 1 at Compl. ¶¶ 162–65 [hereinafter "Compl."].

travel from 2018 through at least 2021.  Their employment agreements grant them "reasonable use" as a perquisite.[3]  Those agreements read, in relevant part:

> Employee will be entitle [sic] to reasonable use of the Company's private airplane, subject to availability determined by the Company's business needs and the ranking of Company employees who are entitled to use the airplane.  Use of the airplane solely for business purposes will not be treated as compensation to Employee.  Use of the airplane with a guest or for other personal matters will be treated as compensation to Employee, and will be reported on an IRS W-2 Form issued to Employee.  The Compensation Committee of the Company's Board of Directors will have sole discretion (i) to determine whether or not Employee's use of the airplane will be treated as compensation to Employee, (ii) to determine the amount of compensation that will be attributed to Employee, in accordance with IRS regulations, and (iii) to put limitations on Employee's use of the airplane for purposes treated as compensation to Employee.[4]

If the Management Defendants do not reimburse Skechers for their personal airplane travel, their use is treated as taxable personal income.[5]  Skechers provides

---

[3] Houston Aff., Ex. 4 at 1812 [hereinafter "Emp. Agr."] § 4.8.  The parties included Weinberg's employment agreement as an exhibit but did not provide the Court with a copy of Robert's or Michael's employment agreements.  Nevertheless, the parties do not dispute that Michael's employment agreement includes the same reasonableness limitation and proceed under the understanding the agreements are the same.  The Management Defendants contend that Robert's employment agreement is no longer in effect.  D.I. 23 at 5 n.2.  But because the complaint pleads Robert's personal use of the airplane is regulated by his employment agreement, and the Management Defendants offer no cognizable basis to set that allegation aside at this stage, I assume at this stage in the proceedings that such an agreement is in effect.

[4] Emp. Agr. § 4.8.

[5] Compl. ¶ 79; Houston Aff. Ex. 21 at 27 [hereinafter "2021 Proxy"].

the Management Defendants with a payment equal to those taxes, called a tax gross-up payment.[6]

### A. Airplane Use

Plaintiff details fifty-two instances in which Weinberg or a member of the Greenberg family used a Company airplane for personal travel between 2019 and 2021.[7] Many of the trips included the Management Defendants' friends and family. At times, the Management Defendants' friends and family members traveled without the Management Defendants, and that use was imputed to the Management Defendants. The Company disclosed in public filings that the Management Defendants received about $5.3 million worth of compensation attributable to personal airplane use between 2018 and 2021.[8] The filings describe that compensation in terms of "incremental costs."[9] "Incremental costs" comprise tax gross-up payments and "variable operating costs, which generally include the cost of crew travel expenses, landing fees, trip-related hangar/parking costs, fuel and

---

[6] Compl. ¶ 79; 2021 Proxy at 27.

[7] Compl. ¶ 119. Plaintiff takes issue with the Management Defendants' personal use of the airplanes in 2018, but does not point to any specific instances of personal travel in 2018.

[8] *See* Skechers U.S.A., Inc., Proxy Statement (Form DEF 14A), at 27–28 (Apr. 12, 2019) [hereinafter "2019 Proxy"]; Skechers U.S.A., Inc., Proxy Statement (Form DEF 14A), at 30–31 (Apr. 9, 2020) [hereinafter "2020 Proxy"]; 2021 Proxy at 30–31; Skechers U.S.A., Inc., Proxy Statement (Form DEF 14A), at 30–31 (Apr. 14, 2022) [hereinafter "2022 Proxy"].

[9] *See, e.g.*, 2021 Proxy at 31.

other variable costs."[10]   The chart below provides reported compensation by defendant and year.[11]

|          | Michael | Robert | Weinberg | Total |
|----------|---------|--------|----------|-------|
| **2018 Use** | $610,078 | $138,823 | $188,366 | $937,267 |
| **2019 Use** | $1,079,146 | $199,734 | $357,952 | $1,636,832 |
| **2020 Use** | $802,038 | $277,010 | $331,805 | $1,410,853 |
| **2021 Use** | $509,742 | $368,355 | $418,980 | $1,297,077 |
| **Total Use** | $3,001,004 | $983,922 | $1,297,103 | $5,282,029 |

Plaintiff alleges that by comparison, "the median value of aircraft perquisites among S&P 500 executives in 2015 was $53,967."[12]

With one exception, the Management Defendants' airplane perquisite compensation represented about 0.5% to about 4.9% of each executives' total compensation during these years.[13]  Personal use of both airplanes exceeded business use in 2020, and personal use exceeded business use for one airplane in 2021.[14]  Still, the combined personal use attributed to the Management Defendants decreased from 2019 to 2020, and again from 2020 to 2021.  Plaintiff alleges that Skechers could

---

[10] *Id.*

[11] All figures from the chart are drawn from Skechers' proxy filings filed in the years 2019 through 2022.  2019 Proxy at 27–28; 2020 Proxy at 30–31; 2021 Proxy at 30–31; 2022 Proxy at 30–31.

[12] Compl. ¶ 16 (citation omitted).

[13] In 2019, personal airplane use represented about 10.3% of Michael's compensation. 2020 Proxy at 30–31.

[14] *See* Compl. ¶¶ 108–10, 112–14.

not "take advantage of the bonus depreciation available under § 280F of the Internal Revenue Code" in years when personal use of an airplane exceeded 50%.[15]

### B. The Compensation Committee Considers Further Limiting Personal Airplane Use.

Defendants Katherine Blair, Morton Erlich, and Richard Siskind (the "Committee Defendants") all serve on Skechers' compensation committee (the "Committee"). Siskind was the Committee's chairman at all relevant times. The Committee's responsibilities include:

> (i) discharging the Board's responsibilities relating to compensation of our executive officers, . . . (iv) overseeing risks related to [Skechers'] compensation programs, (v) the appointment, compensation, independence and performance of the Compensation Committee's independent compensation advisor, and (vi) producing a report on executive compensation for inclusion in our proxy statement in accordance with the applicable rules of the SEC. This includes reviewing and approving the annual compensation of [Skecher's] Chief Executive Officer and other executive officers, reviewing and making recommendations to the Board with respect to executive compensation plans, including incentive compensation and equity-based compensation, and reviewing and approving performance goals and objectives with respect to the compensation of our Chief Executive Officer and other executive officers consistent with our executive compensation plans.[16]

Since at least 2018, the Committee has requested information pertaining to Skecher's executives' personal use of company airplanes.[17] In March of 2018, the

---

[15] *Id.* ¶ 127.

[16] 2021 Proxy at 11.

[17] Houston Aff., Exs. 2–3.

Committee directed management to review the methodology and procedures the Company uses to calculate such income, including retaining a consultant for that purpose.[18] The Committee received updates on management's progress and followed up.[19] The Committee also received other updates and information from management concerning executive perquisite compensation and discussed the topic.[20]

In April of 2018, the Committee asked Skechers' CFO to "provide recommendations for limits to be placed on . . . personal use of the Company's airplanes by officers and other employees."[21] It does not appear the CFO provided any recommendations. On November 26, 2019, the Committee "requested that management develop for review a policy covering personal use of the Company's aircraft."[22] As of the filing of this action in July 2022, the Committee did not receive any such policy, nor did it follow up on management's progress in developing the policy.

---

[18] Houston Aff., Ex. 4 at 1808.

[19] Houston Aff., Ex. 6 at 1837; Houston Aff., Ex. 10; Houston Aff., Ex. 11 at 1857; Houston Aff., Ex. 12.

[20] Houston Aff., Ex. 7 at 1848; Houston Aff., Ex. 13; Houston Aff., Ex. 19 at 0394; Houston Aff., Ex. 20 at 0432; Houston Aff, Ex. 22 at 0463; Houston Aff, Ex. 23 at 2021.

[21] Houston Aff., Ex. 5 at 1833.

[22] Houston Aff., Ex. 13.

### C. The Committee Retains A Compensation Consultant.

On May 27, 2020, Skechers reached a settlement in another action that resolved a dispute over equity grant awards for its executives (the "Equity Grant Litigation").[23] The settlement stipulation required the Committee to "engage a compensation consultant and obtain its recommendations on an annual basis concerning new equity awards to be made to any of Robert Greenberg, Michael Greenberg, and David Weinberg."[24] The Court approved the proposed settlement on August 12.[25] On September 11, the Committee retained compensation consultant FW Cook.[26]

In addition to the settlement's mandate to review equity compensation awards, FW Cook also reported on other aspects of executive compensation, including perquisites.[27] At a July 20, 2021 meeting, the Committee "requested FW Cook to provide a review and analysis of potential changes to various policies regarding the Company's officers' compensation at the Committee's next meeting in October

---

[23] *Police & Fire Ret. Sys. of the City of Detroit v. Greenberg*, C.A. No. 2019-0578-MTZ [hereinafter "Detroit Litig."], D.I. 35 at Stip. for Compromise & Settlement (Del. Ch. May 27, 2020).

[24] *Id.* ¶ 4(a).

[25] Detroit Litig., D.I. 55.

[26] Houston Aff., Ex. 18.

[27] Houston Aff., Ex. 20 at 0431; Houston Aff., Ex. 22 at 0470.

2021."[28]  FW Cook delivered a report at the October 21 meeting.[29]  In that report, FW Cook identified eliminating the tax gross-up payments as a "[p]otential [a]rea[]" for [c]hange in 2022," and noted that stockholders and Institutional Shareholder Services view "[t]ax gross-ups on aircraft and auto perquisites [as] a most problematic pay practice."[30]  FW Cook recommended eliminating the tax gross-ups without increasing "other compensation amounts due to [a] lack of market prevalence and [the] size of other compensation components."[31]  "The Committee also requested FW Cook to prepare a review of the directors' compensation to be presented at a future meeting of the Committee."[32]  The pleading-stage record does not reflect that FW Cook ever presented that information.

> ### D. The Company Issues A Proxy Statement In Connection With Its 2021 Annual Meeting.

In April of 2021 the Company issued its proxy in connection with its upcoming annual meeting (the "Proxy").[33]  The Proxy included only one proposal for the stockholders to vote on:  the election of directors for three Board seats.[34]  As

---

[28] Houston Aff., Ex. 22 at 0463.

[29] Houston Aff., Ex. 23 at 2021.

[30] *Id.* at 2027.

[31] *Id.*

[32] *Id.* at 2021.

[33] 2021 Proxy.

[34] *Id.* at 4.

9

in prior years, the Proxy also disclosed the amount of compensation attributable to Robert's, Michael's, and Weinberg's "personal use" of the airplanes.[35] The Proxy disclosed that those amounts were based on incremental costs.[36] A portion of those incremental costs are attributed to the Management Defendants as follows: "The aggregate incremental cost of use of [Skechers'] aircraft for personal travel by [Michael, Robert, and Weinberg] is allocated entirely to the highest-ranking [of the Management Defendants] present on the flight, unless circumstances indicate a different allocation is warranted."[37] The Proxy stated that because the "aircraft are designated primarily for business travel . . . [Skechers] do[es] not include [in the income attributed to the Management Defendants] the fixed costs that do not change based on usage, such as salaries, . . . aircraft acquisition costs, insurance and general maintenance costs."[38]

### E. This Litigation

Plaintiff sent a books and records demand to the Company in September of 2021 and received documents over the following months.[39] Plaintiff filed his complaint in this action in July of 2022 (the "Complaint"). He asserts four derivative

---

[35] *Id.* at 31.

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] Compl. ¶¶ 85–87.

counts focusing on the Management Defendants' personal airplane use and the Board's perceived failure to curtail it. Count I asserts a claim against the Committee Defendants; additional Company directors Geyer Kosinski and Richard Rappaport; and Jeffrey, who resigned as a director in 2021, (together with the Management Defendants, "Defendants")[40] for "allowing the Greenbergs and Weinberg to utilize the [a]ircraft primarily for personal use, and failing to put in place safeguards (including at a minimum, a personal use policy for the [a]ircraft) even after being put on notice."[41] Count I further alleges that Robert, Michael, and Jeffrey breached their fiduciary duties "by expropriating [Skechers'] assets" for their own personal use.[42] Count II asserts a claim for waste against Defendants for failing to prevent the allegedly excessive personal airplane use. Count III asserts claims for breaches of the duties of disclosure and candor against Robert, Michael, Jeffrey, Weinberg, Erlich, Kosinski, and Siskind for causing Skechers to issue the Proxy, which allegedly omitted material information and included materially false or misleading information about the Management Defendants' personal airplane use. Count IV asserts the Management Defendants breached their employment agreements through "unreasonable" personal use of the airplanes.

---

[40] The Complaint names Thomas Walsh as a defendant, but Plaintiff voluntarily dismissed the claims against Walsh on August 22, 2022. D.I. 11.

[41] Compl. ¶ 178.

[42] *Id.* ¶ 179.

11

Blair, Erlich, Siskind, Jeffrey, Kosinski, and Rappaport moved to dismiss the Complaint.[43] In the absence of a demand, they argue Court of Chancery Rule 23.1 mandates dismissal because Plaintiff failed to plead demand futility. They also moved under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. The Management Defendants separately moved to dismiss the Complaint under Rules 12(b)(6) and 23.1.[44] They joined in the other defendants' Rule 23.1 argument.[45]

## II. ANALYSIS

I begin with the gating question of demand futility and conclude Plaintiff failed to plead demand is futile. Under Court of Chancery Rule 23.1, a derivative complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and the reasons for the plaintiff's failure to obtain the action or for not making the effort."[46] A stockholder may pursue a derivative claim on behalf of a corporation

---

[43] D.I. 26 at Mot. to Dismiss. Nominal defendant Skechers joined in these defendants' motion to dismiss. D.I. 25.

[44] D.I. 22 at Mot. to Dismiss.

[45] D.I. 23 at 1.

[46] Ct. Ch. R. 23.1(a) (2007). Rule 23.1 was amended on September 25, 2023. *In re: Amendments to Rules 7, 10, 17–25, and 171 of the Court of Chancery Rules, Sections, III, IV, and XVI* (Del. Ch. Sept. 25, 2023) (ORDER). No substantive revisions were made to the relevant portion of Rule 23.1. *Id.* at 29. Nevertheless, I proceed under the Rules as they were drafted at the time this action was filed. *Lebanon Cnty. Emps'. Ret. Fund v. Collis*, -- A.3d --, 2023 WL 8710107, at *2 n.19 (Del. Dec. 18, 2023).

only if either: "(a) she has first demanded that the directors pursue the corporate claim and they have wrongfully refused to do so; or (b) such demand is excused because the directors are deemed incapable of making an impartial decision regarding the pursuit of the litigation."[47] Plaintiff did not make a demand and therefore the Complaint "must be dismissed unless it alleges particularized facts showing that demand would have been futile."[48] In *Zuckerberg*, our Supreme Court adopted a three-part demand futility test.[49] It asks the following on a director-by-director basis:

---

[47] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2004).

[48] *Ryan v. Gursahaney*, 2015 WL 1915911, at *5 (Del. Ch. Apr. 28, 2015), *aff'd*, 128 A.3d 991 (Del. 2015).

[49] *United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021).

(i) whether the director received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;

(ii) whether the director faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand; and

(iii) whether the director lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand.[50]

"If the answer to any of the questions is 'yes' for at least half of the members of the demand board, then demand is excused as futile."[51] "Demand futility is 'conducted on a claim-by-claim basis.'"[52]

The demand board includes seven directors: Blair, Erlich, Michael, Robert, Siskind, Weinberg, and nonparty Zulema Garcia. Plaintiff does not allege that Garcia fails any part of the *Zuckerberg* test. Defendants do not contest that Robert, Michael, and Weinberg either received a material personal benefit in connection with the challenged conduct or face a substantial likelihood of liability. Thus, Plaintiff must plead that demand is futile as to one of Blair, Erlich, or Siskind.

---

[50] *Id.*

[51] *Id.*

[52] *In re Vaxart, Inc. S'holder Litig.*, 2021 WL 5858696, at *15 (Del. Ch. Dec. 1, 2021) (quoting *Cambridge Ret. Sys. v. Bosnjak*, 2014 WL 2930869, at *4 (Del. Ch. June 26, 2014)).

Plaintiff argues all three of the Committee Defendants face a substantial likelihood of liability.[53] Plaintiff also argues Siskind lacks independence from Robert.

## A. Substantial Likelihood Of Liability

Plaintiff argues the Committee Defendants face a substantial likelihood of liability for failing to limit the Management Defendants' personal airplane use and for waste. He argues that Erlich and Siskind face a substantial likelihood of liability for causing the Company to issue the Proxy, which allegedly included defective disclosures. This opinion concludes the Committee Defendants do not face a substantial likelihood of liability in connection with any of Plaintiff's claims.

### 1. *Caremark* Liability

I start with whether the Committee Defendants face a substantial likelihood of liability for bad faith failure to exercise adequate oversight, otherwise known as a *Caremark* claim.[54] Plaintiff argues that red flags put the Committee Defendants on notice that the Management Defendants were excessively using the airplanes for personal travel. He contends they ignored these red flags and failed to implement a

---

[53] Defendants argue that the Equity Grant Litigation settlement stipulation included a release that bars Plaintiff's claims to the extent they are based on conduct occurring before May 2, 2020. D.I. 38 at Op. Br. 19–22. The parties agree that the release's language, as drafted, does not bar the claims, but Defendants contend the release includes a scrivener's error, which they urge me to disregard. Unsurprisingly, Plaintiff disagrees and asserts that disregarding a scrivener's error is inappropriate on a motion to dismiss. Because I resolve the motions to dismiss on other grounds, I do not reach the issue of whether the settlement release affects Plaintiff's claims.

[54] *In re Caremark Int'l Inc. Deriv. Litig.*, 698 A.2d 959 (Del. Ch. 1996).

policy to limit such use, and the absence of such a policy caused Skechers to incur excessive operating costs and tax gross-up payments and to lose favorable tax treatment.

Directors "must make a good faith effort to oversee the company's operations."[55] Directors are liable for an oversight failure where "(a) the directors utterly failed to implement any reporting or information system or controls; or (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[56] The latter can be pled by "alleging that the board's information system generated red flags indicating wrongdoing to which the directors failed to respond."[57]

A plaintiff asserting a board ignored a red flag in bad faith has taken fault with the directors' conscious disregard for their duties, and therefore the board's decision not to act.[58] A board's conscious decision to respond to a red flag, including a

---

[55] *Marchand v. Barnhill*, 212 A.3d 805, 820 (Del. 2019).

[56] *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del. 2006).

[57] *In re McDonald's Corp. S'holder Deriv. Litig.*, 291 A.3d 652, 676 (Del. Ch. 2023).

[58] The business judgment rule applies only where a board makes a business decision, and so "inaction is not protected unless it is the result of a conscious decision not to act." 1 Stephen A. Radin, *The Business Judgment Rule: Fiduciary Duties of Corporate Directors* 87 (6th ed. 2009) [hereinafter "Radin"]. Plaintiff presses, as he must to state a claim, that the Committee was conscious that it was not acting, which necessarily requires that the Committee decided not to act. *See, e.g.*, D.I. 44 at Ans. Br. 25 [hereinafter "Pl. Ans. Br."]

16

decision not to act, is protected by the business judgment rule.[59]  Where a board

consciously decides not to act, it is presumed to have done so in good faith; a plaintiff

must plead facts supporting the displacing inference of bad faith.[60]  Because

*Caremark* derives from the requirement that directors act in good faith, a showing

of bad faith is "essential to establish director oversight liability."[61]  And *Caremark*

liability centers on a particular type of bad faith:  "'intentional dereliction of duty'

or 'conscious disregard for one's responsibilities,' which 'is more culpable than

---

("That is precisely what happened here—sustained and conscious inaction in the face of red flags indicating serious misconduct.").

[59] *McDonald's*, 291 A.3d at 676 ("The decision about what to do in response to a red flag is one that an officer or director is presumed to make loyally, in good faith, and on an informed basis, so unless one of those presumptions is rebutted, the response is protected by the business judgment rule."); *Garfield ex rel. ODP Corp. v. Allen*, 277 A.3d 296, 336 (Del. Ch. 2022) ("Delaware law recognizes that conscious inaction represents as much of a decision as conscious action."); *Aronson v. Lewis*, 473 A.2d 805, 813 (Del. 1984) ("[U]nder applicable principles, a conscious decision to refrain from acting may nonetheless be a valid exercise of business judgment and enjoy the protections of the rule."), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000).

[60] *See Aronson*, 473 A.2d at 813 (explaining conscious inaction can be a decision protected by the business judgment rule); *Garfield*, 277 A.3d at 336–39 (same); *Lebanon Cnty. Emps'. Ret. Fund v. Collis* (*Collis I*), 2022 WL 17841215, at *16 (Del. Ch. Dec. 22, 2022) (concluding the pled facts supported both an inference that the board made a legitimate and protected business decision not to act, and a competing inference that the board consciously decided not to act in disregard of their duties, and concluding the plaintiffs got the pleading-stage benefit of the inference they seek), *rev'd on other grounds* -- A.3d --, 2023 WL 8710107 (Del. Dec. 18, 2023)); *In re Walt Disney Co. Deriv. Litig.*, 906 A.2d 27, 52 (Del. 2006) (explaining the business judgment rule's "presumptions can be rebutted if the plaintiff shows that the directors breached their fiduciary duty of care or of loyalty or acted in bad faith").

[61] *Stone*, 911 A.2d at 369–70.

simple inattention or failure to be informed of all facts material to the decision.'"[62] The plaintiff must plead facts allowing "a reasonable inference that the corporate wrongdoing was of such a magnitude and duration that the [b]oard must have known they were not doing their job to look after the corporation's best interests."[63]

Some risks are of such a magnitude that inaction alone can support an inference of bad faith.[64] Some risks are so severe that there is only one right answer: to take tangible action addressing that risk.[65] But as the magnitude or severity of the risk decreases, more facts are required to support an inference of bad faith: continued monitoring, or even intentional inaction, may not alone rebut the business judgment rule.[66] "A failure to undertake immediate remediation of a reported defect,

[62] *Horman v. Abney*, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (quoting *Disney*, 906 A.2d at 66).

[63] *Id.* at *14.

[64] *E.g.*, *Teamsters Loc. 443 Health Servs. & Ins. Plan v. Chou*, 2020 WL 5028065, at *25 (Del. Ch. Aug. 24, 2020) (concluding the plaintiff pled a prong two *Caremark* claim where it pled a failure to take "tangible action" to "address mission critical compliance risks").

[65] *See Garfield*, 277 A.3d at 338 ("The clear answer was to fix the Challenged Awards, and the failure to take that action supports an inference of bad faith conduct."); *cf. Chou*, 2020 WL 5028065, at *25 ("Calling attention to the hiring of law firms to review alleged illegality, without more, is insufficient to refute well-pled allegations that the Board failed to address mission critical compliance risks.").

[66] *See Garfield*, 277 A.3d at 337–38 (offering a hypothetical in which "the Board would not have an easy fix available," suggesting in such a case "[t]he Board might reason that letting the issue go would be better for the Company in the long run," and explaining under those facts a challenge to the board's decision not to act "would founder on the rocks of the business judgment rule"); *Melbourne Mun. Firefighters' Pension Tr. Fund ex rel. Qualcomm, Inc. v. Jacobs*, 2016 WL 4076369, at *12 (Del. Ch. Aug. 1, 2016) (concluding the board adequately responded to red flags suggesting regulatory misconduct and other

even where immediate action would be wise, is not evidence of bad faith unless it implies a need to act so clear that to ignore it implies a conscious disregard of duty."[67] And if a board does act, merely challenging "the manner and timing of the [b]oard's response" will not suffice.[68] In all cases, the polestar remains whether the plaintiff adequately pled facts supporting the inference of bad faith.[69]

Here, it is undisputed that the Committee was aware of the Management Defendants' personal airplane use as of November 2019.[70] That month, the Committee directed management to develop a policy on personal airplane use for

---

violations of law where the board monitored the red flags and then elected to address the relevant regulatory and legal actions through appeals and by focusing on educating industry participants and government officials as to why its practices were legal), *aff'd*, 158 A.3d 449 (Del. 2017); *see also Pettry ex rel. FedEx Corp. v. Smith*, 2021 WL 2644475, at *9 n.101 (Del. Ch. June 28, 2021) ("The number of illegal cigarette shipments dwarfs in comparison to the total number of shipments companywide. To be sure, the illegal cigarette shipments were problematic, needed to be addressed and were addressed. But Plaintiff's *Caremark* claim supposes that this was the only challenge confronting this Board. That also is not reasonably conceivable."), *aff'd*, 273 A.3d 750 (Del. 2022).

[67] *In re MetLife Inc. Deriv. Litig.*, 2020 WL 4746635, at *18 (Del. Ch. Aug. 17, 2020).

[68] *Pettry*, 2021 WL 2644475, at *9; *In re Qualcomm Inc. FCPA S'holder Deriv. Litig.*, 2017 WL 2608723, at *4 (Del. Ch. June 16, 2017) ("These board decisions do not rise to the level of bad faith. Instead, Plaintiffs here simply seek to second-guess the timing and manner of the board's response to the red flags, which fails to state a *Caremark* claim."); *Jacobs*, 2016 WL 4076369, at *9 ("Simply alleging that a board incorrectly exercised its business judgment and made a 'wrong' decision in response to red flags . . . is insufficient to plead bad faith.").

[69] *See Collis I*, 2022 WL 17841215, at *16.

[70] Defendants dispute that the airplane use was a red flag for purposes of *Caremark*, but contend the Committee nevertheless acted to address the alleged problem at the November 2019 meeting. D.I. 38 at Op. Br. 25–32.

the Committee's review.[71] The Committee's action supports the inference that it viewed either the degree of use or absence of meaningful guardrails as a matter worth addressing. Management never presented that policy. The Committee did not receive the policy and did not follow up for more than two and a half years. There was no policy in place when Plaintiff filed suit.

Plaintiff first sees bad faith in the Committee's decision to direct management to draft the policy. Plaintiff contends members of management depended on the Greenberg family for their continued employment, and therefore would be unwilling to curtail their personal airplane use. Delegating the initial drafting of the policy to potentially conflicted individuals does not demonstrate bad faith because the Committee retained oversight over the process and the policy's contents.[72] Plaintiff's challenge amounts to a criticism of the manner and timing of the Committee's response, which is insufficient to state a *Caremark* claim.[73]

From there, Plaintiff's theory of bad faith relies on the fact that the Committee ultimately did not produce a policy restricting personal airplane use. For a time, the

---

[71] Houston Aff., Ex. 13.

[72] *See City of Fort Myers Gen. Emps'. Pension Fund v. Haley*, 235 A.3d 702, 721 n.69 (Del. 2020) ("There is nothing inherently wrong with a Board delegating to a conflicted CEO the task of negotiating a transaction. But the conflict must be adequately disclosed to the Board, and the Board must properly oversee and manage the conflict." (citation omitted)).

[73] *Supra* note 68.

20

Committee was acting in other ways, displacing Plaintiff's theory of bad faith inaction for that period. In May of 2020, Skechers reached a settlement in the Equity Grant Litigation.[74] The Court approved that settlement in August of 2020.[75] Though the settlement called for a consultant to make recommendations as to only equity grant compensation, the Committee directed FW Cook to consider other areas of executive compensation and recommend potential changes to its compensation policies.[76] In October of 2021, FW Cook identified eliminating the tax gross-up payments as a "[p]otential [a]rea[] for [c]hange in 2022," and noted that stockholders and Institutional Shareholder Services view "[t]ax gross-ups on aircraft . . . perquisites [as] a most problematic pay practice."[77] FW Cook recommended eliminating the tax gross-up payments without a corresponding increase in other compensation.[78] The Committee's request that FW Cook study the executive compensation and make recommendations as to policy changes, and its receipt of a

---

[74] Detroit Litig., D.I. 35 at Stip. Compromise & Settlement ¶ 4(a).

[75] Detroit Litig., D.I. 55.

[76] Houston Aff., Ex. 22 at 0463. Plaintiff takes issue with the Committee's decision to delegate the initial policy drafting to management given members of management allegedly relied on Robert for their continued employment. As explained, I disagree with Plaintiff on this point. Nevertheless, given Plaintiff's contention, it seems he would view the decision to have FW Cook evaluate executive perquisite compensation and provide recommendations as a prudent decision.

[77] Houston Aff., Ex. 23 at 2027.

[78] *Id.*

recommendation, reflect attention to the issue, not conscious disregard.[79] The absence of a formal policy during this period is not, alone, sufficient to demonstrate bad faith. Plaintiff's theory of bad faith during this time falters as a mere criticism of the manner and timing of the Committee's response.

After FW Cook presented its report, nine months passed without Committee action, and no formal policy was generated. From this point on, Plaintiff's theory of bad faith relies entirely on the absence of a formal policy limiting personal airplane use. I assume for purposes of this analysis that Plaintiff has pled the Committee intended to take no further action and decided to not implement a formal policy.

Plaintiff has not met his significant burden of pleading that the allegedly excessive compensation was such that a decision not to address it with a formal policy, alone, supports an inference of bad faith.[80] That risk was contained; it was limited to the use of two corporate assets by a discrete group of individuals, as

---

[79] *See Pettry*, 2021 WL 2644475, at *8 (concluding the fact that the board was "kept apprised of the ongoing enforcement actions from inception through settlement," and received updates on "eleven separate occasions," did not support "an inference of bad faith indifference").

[80] *Cf. IBEW Loc. Union 481 Defined Contribution Plan & Tr. ex rel. GoDaddy, Inc. v. Winborne*, 301 A.3d 596, 626–27 (Del. Ch. 2023) (concluding that the company paid $850 million for tax receivable agreement rights worth $175.3 million supported an inference of bad faith and reasoning "[t]he contrast between those figures is so glaring as to support a claim of waste and hence an inference of bad faith on that basis alone").

compared to a widespread operational deficiency.[81] The Company was not violating

an internal policy or any regulations, which can support an inference of bad faith.[82]

The allegedly excessive personal airplane use was also of a relatively minimal

magnitude. In 2021, Skechers' gross profit exceeded $3 billion and its operating

expenses totaled about $2.5 billion.[83] The Management Defendants' airplane

perquisite compensation totaled about $5.3 million over four years; with one

---

[81] *See In re Boeing Co. Deriv. Litig.*, 2021 WL 4059934, at *33–34 (Del. Ch. Sept. 7, 2021) (concluding the plaintiff pled a prong two *Caremark* claim where the board of an airplane manufacturer ignored red flags reflecting widespread airplane safety issues); *Chou*, 2020 WL 5028065, at *25 (concluding the plaintiff pled the demand board faced a substantial likelihood of liability for a prong two *Caremark* claim where the board of a pharmaceutical company ignored red flags showing "contravention of mission critical drug health and safety regulations"); *see also Marchand*, 212 A.3d at 820–24 (reasoning the plaintiff pled a prong one *Caremark* claim where an ice cream manufacturer lacked any board-level system to monitor "whether it is ensuring that the only product it makes—ice cream—is safe to eat").

[82] *See Garfield*, 277 A.3d at 336–340 (concluding the plaintiff adequately pled a prong two *Caremark* claim where the board consciously decided to leave in place an equity award that violated the applicable equity compensation plan); *Boeing*, 2021 WL 4059934, at *33–34 (concluding the plaintiff pled a prong two *Caremark* claim where the board of an airplane manufacturer did not meaningfully respond to airplane crashes and a related news article reporting that its airplane software "had serious engineering defects that were concealed from regulators"); *Chou*, 2020 WL 5028065, at *25 (concluding the plaintiff pled the demand board faced a substantial likelihood of liability for a prong two *Caremark* claim where the board was aware of red flags showing "contravention of mission critical drug health and safety regulations" and "mission critical compliance failures"). At most, there was a breach of the employment agreements' reasonable use requirement. But Plaintiff did not present his *Caremark* claim as relying on the Board's or the Committee's decision not to enforce those agreements as written; Plaintiff argued the Board and Committee failed to put limits on personal use of the airplanes. Compl. ¶¶ 29, 178; Pl. Ans. Br. 24, 30, 32, 36. Only one passing reference in Plaintiff's brief suggests otherwise. Pl. Ans. Br. 35.

[83] Houston Aff. Ex. 25 at 27.

exception, it represented between about 0.5% and 4.9% of each of the Management Defendants' annual compensation during that time. The tax gross-up payments—the only aspect of the airplane perquisite compensation FW Cook identified as problematic—represent even less of that compensation: about $1.6 million over the same period. On average, the tax gross-up payments made up less than 1% of the executives' total compensation from 2018 through 2021.

Plaintiff has failed to demonstrate that the Management Defendants' excessive personal use of Skechers' airplanes, even if in violation of their employment agreements, was of such a scope, magnitude, or questionable legality that the only good faith response was to create a policy. For inaction on that risk to constitute bad faith, Plaintiff would have to plead more.

## 2. Waste

Nor do the Committee Defendants face a substantial likelihood of liability for waste. Plaintiff alleges they face such liability for "consciously allowing" the Management Defendants to "expropriat[e] the Company's [a]ircraft for personal use."[84] The Complaint alleges "[n]o person of ordinary, sound business judgment could possibl[y] conclude that the type, and extent, of personal use described here represents a prudent use of the Company's assets."[85] Plaintiff identifies as evidence

---

[84] Pl. Ans. Br. 44.
[85] Compl. ¶ 184.

24

of waste the expenses imputed to each of the Management Defendants as compensation, lost tax benefits due to a high ratio of personal travel as compared to business travel in 2020 and 2021, and the cost of maintaining a second airplane.

A claim for waste derives from the duty of loyalty's subsidiary element of bad faith.[86] It can operate as an "equitable escape hatch that permits a court to allow a claim to proceed past the pleading stage where something appears sufficiently amiss to warrant discovery."[87] "Conceived more realistically, the doctrine of waste is a residual protection for stockholders that polices the outer boundaries of the broad

---

[86] *CanCan Dev., LLC v. Manno*, 2015 WL 3400789, at *20 (Del. Ch. May 27, 2015) ("Although traditionally viewed as a separate cause of action, a waste claim is best understood as one means of establishing a breach of the duty of loyalty's subsidiary element of good faith." (citing *Stone*, 911 A.2d at 370); *Se. Pa. Transp. Auth. v. Abbvie Inc.*, 2015 WL 1753033, at *14 n.114 (Del. Ch. Apr. 15, 2015) ("This Court has found that, doctrinally, waste is a subset of good faith under the umbrella of the duty of loyalty . . . ."); *Disney*, 907 A.2d at 749 ("The Delaware Supreme Court has implicitly held that committing waste is an act of bad faith." (citing *White v. Panic*, 783 A.2d 543, 553–55 (Del. 2001))).

[87] *McDonald's*, 291 A.3d at 694; *Harbor Fin. P'rs v. Huizenga*, 751 A.2d 879, 895 (Del. Ch. 1999) (referring to waste as an "equitable safety valve" (quoting 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business Organizations* § 4.35, at 4–234 (3rd ed. 1997)); *Sample v. Morgan*, 914 A.2d 647, 670 (Del. Ch. 2007) ("The doctrine of waste, however, allows a plaintiff to pass go at the complaint stage even when the motivations for a transaction are unclear by pointing to economic terms so one-sided as to create an inference that no person acting in a good faith pursuit of the corporation's interests could have approved the terms."); 1 R. Franklin Balotti & Jesse A. Finkelstein, *The Delaware Law of Corporations & Business* Organizations, § 4.16[A], at 4-150 to -151 (4th ed. 2023 Supp.) [hereinafter "Balotti"] ("[E]ven if a transaction has been approved by a disinterested majority of the board or the requisite vote of disinterested stockholders, there is still an equitable safety valve in the form of the court's determination of whether the transaction constituted a gift or waste.").

25

field of discretion afforded directors by the business judgment rule."[88]  The waste

inquiry is an objective one.[89]  Plaintiffs can assert a "version of waste" by pleading

that "a decision [was] so extreme as to be inexplicable on any basis other than bad

faith."[90]

Our case law frames waste in the context of director approval of an irrational

"exchange" or transaction, often with a focus on whether the company received

---

[88] *Sample*, 914 A.2d at 669.

[89] *See Winborne*, 301 A.3d at 621–22.

[90] *McDonald's*, 291 A.3d at 694.

26

adequate consideration.[91]  Leading treatises are in accord.[92]  This focus is consistent

with waste's roots in the *ultra vires* doctrine.[93]  But Plaintiff does not challenge the

---

[91] *Disney*, 906 A.2d at 74 ("To recover on a claim of corporate waste, the plaintiffs must shoulder the burden of proving that the exchange was 'so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)); *White*, 783 A.2d at 554 ("A board's decisions do not constitute corporate waste unless they are exceptionally one-sided.  Accordingly, we have defined 'waste' to mean 'an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.'" (footnote omitted) (quoting *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000)); *Brehm v. Eisner*, 746 A.2d 244, 263 (Del. 2000) ("Most often the claim is associated with a transfer of corporate assets that serves no corporate purpose; or for which no consideration at all is received.  Such a transfer is in effect a gift." (internal quotation marks omitted) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997)); *Grobow v. Perot*, 539 A.2d 180, 189 (Del. 1988) ("[T]he issue becomes whether the complaints state a claim of waste of assets, i.e., whether 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth that which the corporation has paid.'" (quoting *Saxe v. Brady*, 184 A.2d 602, 610 (Del. Ch. 1962), *overruled on other grounds by Brehm*, 746 A.2d 244; *McDonald's*, 291 A.3d at 693 ("A transaction constitutes waste when it is so one-sided that no rational person acting in good faith could approve it.  Put differently, it involves 'an exchange that is so one-sided that no businessperson of ordinary, sound judgment could conclude that the corporation has received adequate consideration.'" (quoting *Brehm*, 746 A.2d at 261); *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del. Ch. 1997) ("The judicial standard for determination of corporate waste is well developed.  Roughly, a waste entails an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade."); *id.* at 338 (describing the "classical waste test" as "no consideration; gift; no person of ordinary prudence could possibly agree, etc."); *Saxe v. Brady*, 184 A.2d 602 (Del. Ch. 1962) ("Where waste of corporate assets is alleged, the court, notwithstanding independent stockholder ratification, must examine the facts of the situation.  Its examination, however, is limited solely to discovering whether what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid.").

[92] 2 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 15.05[e][1][iii], at 15-47 (2023) ("A transaction will be deemed to constitute waste only when the consideration received for corporate assets is 'so disproportionately small as to lie beyond the range at which a reasonable person might be

directors' decisions to enter into the Management Defendants' employment agreements granting reasonable personal airplane use.  Rather, Plaintiff faults Defendants for not intervening to prevent the Management Defendants' ongoing allegedly excessive use.  Plaintiff cites no case in which a Delaware court has

willing to trade'" (quoting *Lewis*, 699 A.2d at 336); 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 14.03[1], at 14-10 (2022) ("The term 'corporate waste' in the context of officer compensation has been defined as a circumstance where 'no person of ordinary, sound business judgment would be expected to entertain the view that the . . . [service to be rendered] was a fair exchange for the [compensation] which was given.'" (alterations in original) (quoting *Saxe*, 184 A.2d at 610); 1 Balotti § 4.16[A], at 4-150 to -151 (explaining where a transaction was "approved by a disinterested majority of the board or the requisite vote of disinterested stockholders . . . "[t]he only inquiry . . . is into whether the consideration paid in the transaction is so inadequate that no reasonable person could conclude the transaction was other than a gift or waste, thereby rendering the business judgment doctrine inapplicable"); *id.* § 4.11[A], at 4-51 (framing waste standard applied to compensation decisions as evaluating an exchange in terms of a quid pro quo); 1 Radin at 388 ("A waste claim requires showing that the corporation has entered into a transaction in which it received consideration '"so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid."'" (quoting *Grobow*, 539 A.2d at 190)); 3A *Fletcher Cyclopedia of the Law of Corporations* § 1102 (Sept. 2023 Update) ("Corporate waste has been defined as an exchange of corporate assets for consideration so disproportionately small as to lie beyond the range at which any reasonable person might be willing to trade.  To state a claim for waste, a plaintiff must allege particularized facts that lead to a reasonable inference that the director defendants authorized an exchange that is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration." (footnote omitted)); *see also* Harwell Wells, *The Life (and Death?) of Corporate Waste*, 74 Wash. & Lee L. Rev. 1239, 1240 (2017) (stating the "classic definition of waste" is "a transaction in which 'what the corporation has received is so inadequate in value that no person of ordinary, sound business judgment would deem it worth what the corporation has paid . . . .'" (quoting *Saxe*, 184 A.2d at 610)).

[93] *McDonald's*, 291 A.3d at 693 (citing Harwell Wells, *The Life (and Death?) of Corporate Waste*, 74 Wash. & Lee L. Rev. 1239, 1243–48 (2017)); *Huizenga*, 751 A.2d at 895–96 ("The origin of this rule is rooted in the distinction between voidable and void acts, a distinction that appears to have grown out of the now largely abolished *ultra vires* doctrine." (footnote omitted)).

evaluated a claim for waste based on a failure to act to prevent ongoing harm as opposed to challenging the decision to enter into a transaction, and I am aware of none. Though the parties briefed the waste argument more generally, neither party briefed this specific issue.

Assuming waste could doctrinally apply here, Plaintiff failed to carry his burden. The Committee's decision not to implement a formal policy curtailing personal airplane use was not extreme by any metric. As explained, the entirety of the Management Defendants' airplane perquisite compensation totaled about $5.3 million between 2018 and 2021, representing about 2.6% of their total compensation during that time. FW Cook identified only the tax gross-up payments as potentially problematic, which represent only about $1.6 million, or less than 1%, of their total compensation from 2018 to 2021. These figures are not sufficiently extreme to serve as objective indicia that the Committee Defendants' decision not to intervene was extreme, irrational, or suffered from deeper, less visible problems.

Plaintiff also sees evidence of waste in the Company's retention of a second airplane even though personal use for both airplanes exceeded business use in 2020 and personal use for one airplane exceeded business use in 2021. Plaintiff does not plead the airplanes had any uses other than personal travel and business travel. The Management Defendants' total personal use decreased from 2019 to 2020, and then decreased again from 2020 to 2021. For personal use to have surpassed business

use, business use must have decreased even more.[94] Plaintiff pled no facts showing that trend would continue, and in fact he pleads business travel increased from 2020 to 2021.[95] I cannot infer bad faith from the retention of a second airplane in the context of a short-term drop in business travel relative to personal use.

Finally, the loss of favorable tax treatment for both airplanes in 2020 and one airplane in 2021 does not constitute evidence of waste. Plaintiff has not pled the Committee Defendants were aware that personal travel exceeded business travel in these years as it was occurring. In other words, though Plaintiff could argue these amounts are damages flowing from waste, Plaintiff has not pled the Committee Defendants had this information and ignored it in bad faith. This argument resembles an attempt to impose liability by hindsight, which our courts have rejected in the waste context.[96] Plaintiff's waste claim fails.

---

[94] Plaintiff's brief conceded that business travel decreased. D.I. 49 at Ans. Br. 3 ("Indeed, their misuse of the Company [a]ircraft was exacerbated during the pandemic; when Skechers' personal use rose exponentially, and business use dropped, meaning that the Company gave up huge potential tax benefits.").

[95] *See* Compl. ¶¶ 108–10, 112–14.

[96] *Winborne*, 301 A.3d at 621 ("What actually happens down the road is a different issue than whether the decision appears extreme when made. Inferring bad faith because a decision turned out badly would impose liability by hindsight."); *Ash v. McCall*, 2000 WL 1370341, at *8 (Del. Ch. Sept. 15, 2000) (explaining "examining a corporate transaction with perfect 20/20 hindsight and declaring that it turned out horribly" to substantiate a waste claim "confuses the due care standard with substantive due care—a concept that is foreign to the business judgment rule"); *see Protas v. Cavanagh*, 2012 WL 1580969, at *9 (Del. Ch. May 4, 2012) ("[A] finding of waste is inappropriate, even if hindsight proves that the transaction may have been ill-advised.").

### 3.    Disclosure Claims

Plaintiff argues Erlich and Siskind face a substantial likelihood of liability for violating their duties of disclosure and candor.  Directors can be liable for causing a corporation to issue a proxy that is materially false or misleading, or that omits material information.[97]  "In the absence of a request for stockholder action, the Delaware General Corporation Law does not require directors to provide shareholders with information concerning the finances or affairs of the corporation."[98]  But when the board chooses to speak outside of that context, or is compelled by another source of law to speak, the directors may not knowingly cause the company to issue false disclosures.[99]

"When directors request discretionary stockholder action, they must disclose fully and fairly all material facts within their control bearing on the request."[100]  A misstatement or omission gives rise to a disclosure claim only where it is material as to the stockholder vote in question.[101]  This is true even where the plaintiff alleges

---

[97] *See New Enter. Assocs. 14, L.P. v. Rich*, 292 A.3d 112, 144 (Del. Ch. 2023).

[98] *Malone v. Brincat*, 722 A.2d 5, 11 (Del. 1998).

[99] *Dohmen v. Goodman*, 234 A.3d 1161, 1168–69 (Del. 2020); *see also Malone*, 722 A.2d at 10 (Del. 1998) ("[W]hen directors communicate publicly or directly with shareholders about corporate matters the *sine qua non* of directors' fiduciary duty to shareholders is honesty.").

[100] *Dohmen*, 234 A.3d at 1168.

[101] *See id.*; *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000) ("Omitted facts are not material simply because they might be helpful.  To be actionable, there must be a

an omission rendered a partial disclosure misleading.[102]  Information is material "if

there is a substantial likelihood that a reasonable shareholder would consider it

important in deciding how to vote."[103]  "Put another way, there must be a substantial

likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information

made available."[104]  "Materiality is determined with respect to the shareholder action

being sought."[105]  "The burden of demonstrating a disclosure violation and of

substantial likelihood that the undisclosed information would significantly alter the total mix of information already provided."); *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 66 (Del. 1995) ("Non-disclosure claims must provide some basis for a court to infer that the alleged omissions were material."); *see also Malone*, 722 A.2d at 10 ("The duty of disclosure obligates directors to provide the stockholders with accurate and complete information material to a transaction or other corporate event that is being presented to them for action.").

[102] *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making . . . a partial disclosure that is materially misleading." (first alteration in original) (internal quotation marks omitted) (quoting *Pfeffer v. Redstone*, 2008 WL 308450, at *8 (Del. Ch. Feb. 1, 2008), *aff'd*, 965 A.2d 676 (Del. 2009))); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1057 (Del. 1996) ("The partial disclosure rule is implicated only where the omission of a related fact renders the partially disclosed information materially misleading."); *see also O'Reilly v. Transworld Healthcare, Inc.*, 745 A.2d 902, 916 (Del. Ch. 1999) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a partial disclosure that is materially misleading.").

[103] *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1277 (Del. 1994) (internal quotation marks omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[104] *Id.* (internal quotation marks omitted) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[105] *Malone*, 722 A.2d at 12; *In re Ebix, Inc. S'holder Litig.*, 2016 WL 208402, at *22 (Del. Ch. Jan. 15, 2016) ("[T]he challenged disclosures must be material and 'connect[ed] to the

establishing the materiality of requested information lies with the plaintiffs."[106]  To plead a loyalty claim based on false or otherwise deficient disclosures, the plaintiff "must allege a knowing or intentional" violation.[107]

Plaintiff alleges five omissions or misstatements.  First, Plaintiff alleges the Proxy's statement that "the [a]ircraft are 'designated primarily for business travel'"[108] was false because "Skechers' [a]ircraft is primarily designated for [the Management Defendants'] personal travel."[109]  Plaintiff's only support for this position is the fact that personal use for both airplanes exceeded business use in 2020, and personal use for one airplane exceeded business use in 2021.  Plaintiff has not shown or argued each airplane's designation is tied to the airplane's use in any given year.  Plaintiff failed to meet his burden in establishing this statement was false.

Second, Plaintiff claims that "because the [a]ircraft were primarily designated for personal use, [fixed costs (such as maintenance, aircraft acquisition costs, and

---

request' for [requested stockholder] actions." (first alteration in original) (quoting *Malone*, 722 A.2d at 12); *see also Stroud v. Grace*, 606 A.2d 75, 85 (Del. 1992) ("Delaware law imposes upon a board of directors the fiduciary duty to disclose fully and fairly all material facts within its control that would have a significant effect upon a stockholder vote.").

[106] *In re CheckFree Corp. S'holders Litig.*, 2007 WL 3262188, at *2 (Del. Ch. Nov. 1, 2007).

[107] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *11 (Del. Ch. Dec. 30, 2019).

[108] Compl. ¶ 123 (quoting 2021 Proxy at 31).

[109] *Id.* ¶ 124.

pilot salaries)] should have been included in the [Management Defendants'] listed perquisites."[110]  As explained, Plaintiff failed to demonstrate that the airplanes were primarily designated for personal use.  Because Plaintiff's argument depends on that proposition, Plaintiff has failed to substantiate this alleged violation.

Third, Plaintiff argues the Proxy should have disclosed "the sheer volume of the [Management Defendants'] personal use of the [a]ircraft as compared to the [a]ircraft's total flight hours," because "a reasonable stockholder would find it material that the Company needs a second [a]ircraft because roughly 53% of the combined flight time of the [a]ircraft is attributable to personal use by the Greenberg family, along with Weinberg."[111]  Plaintiff must show this omission was material to the stockholder vote in question to establish liability.[112]  Skechers' stockholders were being asked to vote in a director election.  Plaintiff has not shown that the relative amount of the Management Defendants' personal airplane use, which was compensation for their service as officers, was material to a vote to elect directors.  Plaintiff argues the alleged disclosure deficiencies reflect the Board was unwilling or unable to "act adverse to Defendant Robert's interests."[113]  But as explained,

---

[110] Pl. Ans. Br. 43; Compl. ¶¶ 125–26.

[111] Pl. Ans. Br. 15; Compl. ¶ 128.

[112] *Malone*, 722 A.2d at 12.

[113] Pl. Ans. Br. 42.

Plaintiff failed to establish that the Committee's decision not to further limit the Management Defendants' airplane perquisite compensation was wrongful.[114]

Fourth, Plaintiff alleges that the Proxy was misleading because it "disclosed that '[d]uring 2020, Robert Greenberg, Michael Greenberg and David Weinberg used [Skechers'] aircraft for personal travel,'" and "omit[ed] that other Greenberg family members" used the airplane and "attributed that use to" the Management Defendants.[115] The Proxy disclosed how Skechers calculated the total compensation

---

[114] Plaintiff also argues that all the alleged disclosure issues were material because an SEC publication states that "[i]n light of the importance of the subject to many investors, all participants should approach the subject of perquisites and personal benefits thoughtfully." *Id.* (alteration in original) (internal quotation marks omitted) (citation omitted)). Additionally, Plaintiff cites federal regulations requiring the disclosure of perquisites over a certain dollar value. *Id.* at 42 n.23 (citing 17 C.F.R. § 229.402). Neither source states that all matters concerning executive compensation are material for purposes of the fiduciary duties of disclosure or candor. I decline to adopt Plaintiff's proposed per se materiality rule, for which he has cited no case law for support.

Similarly, Plaintiff suggests that "fixed costs should be included in aircraft disclosures when personal usage exceeds 20% to 30%." Pl. Ans. Br. 43. The only support Plaintiff identifies is a 2012 news article reflecting an Atlanta-based attorney's view that "*companies should probably include fixed costs in their aircraft disclosures when personal usage exceeds 20% to 30% of the overall flying time. 'To do otherwise would be misleading*.'" *Id.* at 43 n.24 (emphasis in original). I do not reach the issue of whether this disclosure was misleading, and therefore do not consider this argument.

Finally, Plaintiff argues that because Robert and Erlich were seeking reelection in connection with the 2021 annual meeting, they "clearly benefited significantly from keeping the true information related to the magnitude and nature of the "Management Defendants'] perquisites and the resultant tax implications for the Company from stockholders." Pl. Ans. Br. 44. I read this argument to go to those defendants' scienter, and do not see Plaintiff as having gone the next step of tying this theory to materiality for stockholders.

[115] Pl. Ans. Br. 39–40; Compl. ¶ 190.

attributed to the Management Defendants:  "The aggregate incremental cost of use of [Skechers'] aircraft for personal travel by [Michael, Robert, and Weinberg] is allocated entirely to the highest-ranking [of the Management Defendants] present on the flight, unless circumstances indicate a different allocation is warranted."[116]  Even assuming it is misleading to not disclose that the last clause covers situations in which the Management Defendants are not on the airplanes, Plaintiffs have not shown this information is material in relation to the director election.[117]

Fifth, Plaintiff argues the Proxy failed "to disclose to its shareholders that it has significant and material disallowed tax deductions, and gross up payments, in addition to being unable to take advantage of the bonus depreciation available under § 280F of the Internal Revenue Code" because personal use exceeded business use during 2020 and 2021.[118]  Plaintiff has not shown these matters were material to the director election at issue and therefore failed to meet his burden of showing this omission was material.

Plaintiff has not pled Erlich and Siskind face a substantial likelihood of liability in connection with the disclosure claims.

---

[116] 2021 Proxy 31.

[117] To the extent Plaintiff is challenging the failure to disclose that others traveled on the airplane with the Management Defendants, he has failed to show both that the Proxy was misleading and that this information was material.

[118] Compl. ¶ 127.  The Proxy disclosed the gross-up payments made to each of the Management Defendants.  2021 Proxy at 31.

## B.     Lack Of Independence

Plaintiff argues Siskind lacks independence from Robert, who received a material personal benefit from his airplane use and who faces a substantial likelihood of liability.  Delaware law presumes directors are independent.[119]  "[A] lack of independence turns on 'whether the plaintiffs have pled facts from which the director's ability to act impartially on a matter important to the interested party can be doubted because that director may feel either subject to the interested party's dominion or beholden to that interested party.'"[120]  A lack of independence can be established through social, financial, or other ties reflecting the existence of a bias-producing relationship.[121]  "[T]he question is 'whether, applying a subjective standard, those ties were *material*, in the sense that the alleged ties could have affected the impartiality of the individual director.'"[122]  The inquiry is holistic[123] and the Court evaluates independence on a "case-by-case basis."[124]  Though Rule 23.1

---

[119] *Friedman v. Dolan*, 2015 WL 4040806, at *6 (Del. Ch. June 30, 2015) (citing *In re MFW S'holders Litig.*, 67 A.3d 496, 509 (Del. Ch. 2013)).

[120] *Marchand*, 212 A.3d at 818 (alteration in original) (internal quotation marks omitted) (quoting *Sandys v. Pincus*, 152 A.3d 124, 128 (Del. 2016)).

[121] *See Beam*, 845 A.2d at 1051.

[122] *Zuckerberg*, 262 A.3d at 1061 (quoting *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A.3d 754 (Del. 2018)).

[123] *Del. Cnty. Emps. Ret. Fund v. Sanchez*, 124 A.3d 1017, 1022 (Del. 2015).

[124] *Beam*, 845 A.2d at 1051.

requires that a plaintiff plead this lack of independence with particularity, the Court will draw all reasonable inferences in the plaintiff's favor.[125]

Plaintiff argues Siskind lacks independence from Robert because he "depends on Robert and the Greenberg family for his continued employment as a director."[126] This fact alone, without other particularized allegations that Siskind is beholden to Robert, does not impugn Siskind's independence.[127]

Plaintiff also contends that Robert and Siskind "share[] a unique and reciprocally-beneficial relationship."[128] Some of that relationship runs through a company called Stage II Apparel Pty Ltd., where Siskind was president and CEO. The first tie is a 1999 sale of certain Skechers trademarks from the Greenberg family trust to Stage II. Plaintiff alleges Robert caused Siskind to be appointed to Skechers' Board shortly after the sale was completed. Plaintiff also alleges the two also served together on Stage II's board of directors. Finally, Plaintiff alleges that Robert served on Stage II's compensation committee until 2002, and that Siskind currently serves on Skechers' compensation committee.

---

[125] *Sanchez*, 124 A.3d at 1020.

[126] Pl. Ans. Br. 49.

[127] *City of Hialeah Emps'. Ret. Sys. ex rel. nCino, Inc. v. Insight Venture P'rs, LLC*, 2023 WL 8948218, at *9 (Del. Ch. Dec. 28, 2023) (citing *Beam*, 845 A.2d at 1054; and *Teamsters Union 25 Health Servs. & Ins. Plan v. Baiera*, 119 A.3d 44, 67–68 (Del. Ch. 2015)).

[128] Pl. Ans. Br. 50.

Plaintiff has not pled facts from which the Court can infer that the trademark sale was anything other than an arms-length transaction. Plaintiff has not pled what was purchased, the price, or whether Siskind or Robert were personally involved. And absent additional facts, Robert's service on Stage II's compensation committee while Siskind was Stage II's president and CEO, and Siskind's service on Skechers' compensation committee while Robert was a Skechers executive, does not represent a benefit to either man. Plaintiff requests that I presume, without any support, that from some time in 1999 through 2002, both Siskind and Robert used their committee positions to benefit the other. But our law presumes that directors will carry out their duties in good faith.[129] Finally, the fact that the two overlapped in their service on Stage II's board of directors does not alone impugn Siskind's independence.[130]

Plaintiff also points to ties between Siskind and Robert outside their professional lives.[131] Plaintiff alleges Siskind sold Robert a home in Boca Raton, Florida in 1998. He alleges that Robert now has another home nearby, such that the two are neighbors. Most remarkably, Plaintiff alleges "their piers for their watercraft

---

[129] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2023 WL 6399095, at *18 (Del. Ch. Oct. 3, 2023) ("This Court presumes directors' fidelity to their fiduciary duties.").

[130] *Patel v. Duncan*, 2021 WL 4482157, at *20 (Del. Ch. Sept. 30, 2021), *aff'd* 277 A.3d 1257 (Del. 2022).

[131] Plaintiff briefed and argued the more abstract position that geographic proximity indicated friendship, but did not go so far as to plead that Greenberg and Siskind are friends. Rule 23.1 requires particularized pleading. I will consider only what Plaintiff has actually pled.

face each other."[132]   From these facts, Plaintiff concludes that "[d]emanding that Siskind sue his neighbor, and twenty-plus year fellow Board member, Robert Greenberg, would be futile."[133]

Plaintiff has not pled a relationship that would impugn Siskind's independence.  Selling another a home nearly twenty-five years ago does not alone establish a material relationship.  It is simply not the case that neighbors are unwilling to sue each other:  this Court's equitable docket is rife with such suits, and this judicial officer has presided over many.  That leaves one allegation:  that the piers face each other.  Plaintiff offers no explanation as to why this fact would disable Siskind from independently performing his duties as a Delaware director.  I can think of none.  Plaintiff has failed to plead that Siskind lacks independence from Robert.

## III.   CONCLUSION

Plaintiff has failed to plead that demand is futile under Court of Chancery Rule 23.1.  Defendants' motions are **GRANTED**.

---

[132] Compl. ¶ 173.

[133] *Id.* ¶ 175.